**STEPOVAK–SHUMAGIN SET NET ASSOCIATION, Appellant,**

v.

**STATE of Alaska, BOARD OF FISHERIES, Appellee.**

and

**Chignik Seiners Association, Inc., Intervenor.**

**No. S–5679.**

Supreme Court of Alaska.

Dec. 9, 1994.

---

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, for appellant.

Jeffrey T. Killip, Asst. Atty. Gen., Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Gregory F. Cook, Douglas, and Bruce B. Weyhrauch, Faulkner, Banfield, Doogan & Holmes, Juneau, for intervenor.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

COMPTON, Justice.

At issue is the validity of Title 5, section 09.366 (regulation) of the Alaska Administrative Code (AAC). This regulation was adopted by the Board of Fisheries (Board) in 1991. This regulation delays, until July 20, the opening of the commercial salmon post-June set net fishing season within the Shumagin Islands section of the Southern Alaska Peninsula. Previously the South Peninsula fisheries had opened to commercial fishing on approximately July 6. Stepovak–Shumagin Set Net Association (SSSNA) challenges the regulation on the following theories: (1) the regulation is not reasonably necessary for purposes of conservation and development, (2) the regulation is arbitrary, (3) the Board's decision is not adequately explained in its decisional document, and (4) the regulation does not provide SSSNA a fair and reasonable opportunity to take salmon for commercial fishing. SSSNA asks this court to declare the regulation invalid and reverse the superior court's award of attorney's fees. In the alternative, it asks that this case be remanded to the Board for further proceedings. We sustain the regulation.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

The South Peninsula consists of Pacific Ocean coastal waters extending east of Kupreanof Point to Scotch Cap on Unimak Island. It is divided into four districts: (1) the Southeastern District, which includes the Shumagin Islands, (2) the South Central District, (3) the Southwestern District, and (4) the Unimak District. Five species of Pacific salmon are commercially harvested in post-June South Peninsula fisheries: chinook, sockeye, pink, chum and coho salmon. Generally, the South Peninsula fisheries had opened to commercial salmon fishing about July 6.[1]

In November 1991 the Board considered two proposed regulations, 115A and 117. Proposal 115A, presented by the Chignik Fishermen's Association, would have prohibited commercial fishing, from July 1 through July 25, in the areas of the Southeastern District which are not included in the Southeastern District Salmon Management Plan.[2] This proposal was submitted in hopes of diminishing the interception of migratory sockeye headed for Chignik fishing areas. The proponents of 115A contended that the "intercept harvest of Sockeye in the Shumagin Islands has increased four fold from pre-1986 levels to the present. This is an expanding, uncontrolled, unintentional reallocation of fully utilized stocks." The Alaska Department of Fish and Game (ADF & G) took no position with respect to proposal 115A because it viewed the proposal as an attempt to reallocate fish from one area to another. ADF & G did note, however, that the Board might want to review fishing areas in the Shumagin Islands to establish whether regulation was warranted to prevent future expansion. Additionally, ADF & G indicated that they were concerned with the repercussions of overharvesting these fisheries.

Nushagak Advisory Committee submitted proposal 117. The Nushagak Advisory Committee alleged that coho salmon destined for Nushagak were being harvested in the Shumagin Islands. Proposal 117 suggested a regulation that would restrict the interception of coho salmon in the Shumagin Islands and South Unimak to protect Bristol Bay and Western Alaska coho stocks, to reflect the historical harvest of coho salmon prior to the last ten years. The proponents of proposal 117 alleged that Nushagak and Togiak coho are present in the Shumagins and that low coho catches in these two terminal areas indicated a need for restricting the interception of coho salmon in the Shumagins. ADF

---

1. Two major exceptions to the South Peninsula general opening dates were (1) the Southeastern District Mainland fishery, which is managed through July 25 under the Southeastern District Salmon Management Plan, 5 AAC 09.360, and (2) the portion of Cold Bay Section north of 551° 10′ N. lat.

2. The Southeastern District Salmon Management Plan, 5 AAC 09.360, allocates a certain percentage of Chignik bound sockeye to the participants in this fishery along the Southeastern District Mainland. This management plan is not at issue.

& G opposed the proposal, believing that closure would hamper local pink salmon management and might adversely impact fish quality.

The Board recognized the relationship between proposals 115A and 117: Both covered similar dates for closing the fishing season in the Shumagins. The Board amended 115A, changing the proposed closure dates from July 1 through July 25 to July 1 through July 15. However, the Board rejected the amended version.

During its deliberations on proposal 117, the Board considered an amendment to the proposal specifying certain geographical areas of the South Peninsula; it was later withdrawn. A committee was formed to develop a South Peninsula coho management plan. Although none of the committee's actions or deliberations were recorded, a Board member, who acted as the committee chairman, reported on some of the subjects discussed. The committee chairman submitted an amendment to proposal 117 suggesting an opening date of July 20 for the Shumagin Islands, July 6 for some areas including Pavlof Bay, and leaving the dates for other areas to be decided by the Board. The July 20th date was suggested as a compromise because it was midway between the July 15 and 25 dates considered during the discussion of proposal 115A. After rejecting a proposal to delay opening the Shumagin Islands until July 23, the Board adopted the Post–June Salmon Management Plan for the Southern Alaska Peninsula, 5 AAC 09.366. Under the regulation, certain areas will open for commercial salmon fishing on the traditional July 6 date while other areas will open two weeks later on July 20.[3]

In June 1992, SSSNA filed a complaint seeking declaratory and injunctive relief against enforcement of the Post–June Salmon Management Plan. On July 2, 1992, four days before the prior opening date for the

Shumagin fisheries, SSSNA filed a motion for a preliminary injunction which the court granted. The Chignik Seiners Association, Inc. (CSA), moved for and was granted leave to intervene. SSSNA then filed a Motion for Summary Judgment, and the CSA and the State responded by filing cross-motions for summary judgment. In February 1993, the court dissolved the preliminary injunction, denied SSSNA's Motion for Summary Judgment, and granted the cross-motions of CSA and the State for summary judgment. The court determined that the State and CSA were the prevailing parties, and awarded them partial attorney's fees. This appeal follows. *See* AS 22.05.010; Alaska R.App.P. 204.

## II. *DISCUSSION*

### A. STANDARDS OF REVIEW

■ This court reviews *de novo* a superior court's order granting summary judgment. *Alaska Fish Spotters Ass'n v. State, Dep't of Fish and Game*, 838 P.2d 798, 800 (Alaska 1992). "[S]ummary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

■ We must give substantial deference to the Board's decision to adopt 5 AAC 09.366.

[W]here an administrative. regulation has been adopted in accordance with the procedures set forth in the Administrative Procedure Act, and it appears that the legislature has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation, we will review the regulation in the following manner: First, we will ascertain whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency. This aspect of review insures that the agency has

---

**3.** Areas to open on the traditional July 6 date include some portions of the Shumagin Islands Section of the Southeastern District, Canoe Bay and portions of the Pavlof Bay Sections of the South Central District, and the Cold Bay, Thin Point and Morzhovoi Bay Sections of the Southwestern District. 5 AAC 09.366.

Areas where the opening was delayed until July 20 include other portions of the Shumagin Islands Section of the Southeastern District, areas of the Southcentral District excluding all waters of the Pavlof Bay Section north of Black Point, and the Southwestern District excluding Cold Bay, Thin Point, Morzhovoi Bay and the Unimak District. 5 AAC 09.366.

not exceeded the power delegated by the legislature. Second, we will determine whether the regulation is reasonable and not arbitrary.

*Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971). This court will not substitute its own judgment for the Board's, particularly "since highly specialized agency expertise is involved." *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 174 (Alaska 1987). "[T]he 'wisdom' of a regulation is not a subject of review." *Kingery v. Chapple,* 504 P.2d 831, 835 (Alaska 1972). This court's role is to ensure only that the agency has taken a "hard look" at the salient problems and has "genuinely engaged in reasoned decision making." *Gilbert v. State, Dep't of Fish and Game,* 803 P.2d 391, 398 (Alaska 1990) (citations omitted).

## B. THE REGULATION IS CONSISTENT WITH AND REASONABLY NECESSARY FOR PURPOSES OF CONSERVATION AND DEVELOPMENT

■ The Alaska Legislature created the Board of Fisheries "[f]or purposes of the conservation and development of the fishery resources of the state." AS 16.05.221(a). This court has previously interpreted this statute. " 'Conserving' implies controlled utilization of a resource to prevent its exploitation, destruction or neglect. 'Developing' connotes management of a resource to make it available for use." *Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State,* 628 P.2d 897, 903 (Alaska 1981). Additionally, the Board's power to control fishery resource utilization allows it to allocate the salmon harvest between competing users. *Meier,* 739 P.2d at 174. Furthermore, AS 16.05.251 lists numerous purposes for which the Board may adopt regulations it considers advisable in accordance with the Administrative Procedure Act. For example, the Board may establish open and closed seasons and areas,

and regulate commercial fishing as needed for the conservation, development, and utilization of fisheries. AS 16.05.251(2), (12).

The Post–June Salmon Management Plan was intended to accomplish the following objectives: (1) maximize full utilization of the targeted species for these fisheries (local pink and chum stocks) when they are at high quality and present in abundance, (2) minimize the interception of migrating sockeye bound for other areas, including Chignik, for allocation and conservation reasons, (3) minimize the interception of migrating coho salmon bound for other areas (which may include Nushagak and Togiak areas) for conservation purposes, and (4) minimize the interception of immature sockeye and chum salmon to alleviate biological and conservation concerns.[4]

■ The Board argues that the regulation promotes controlled utilization of the fishery resource in an effort to prevent its exploitation, destruction, and neglect. Additionally, the Board contends that the regulation helps manage the resource making it available for use. Therefore, the Board concludes that the regulation falls within the confines of AS 16.05.221.

SSSNA does not dispute that the Board has the power to establish regulations that affect conservation and development. Instead, it argues that the regulation adopted is not reasonably necessary to prevent overharvesting and there is no need for reallocation.[5] *See Kelly,* 486 P.2d at 911 (the court needs to "ascertain whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency."). Specifically, SSSNA contends that the record does not substantiate that South Peninsula sockeye or coho stocks are in jeopardy of being overharvested or that

---

**4.** The Board's findings list as factors considered in its decision to adopt the July 20th opening date: the full utilization of local pink and chum stocks; stabilization of the interception of sockeye stocks; and minimization of the interception of coho.

**5.** AS 44.62.030 provides:

If, by express or implied terms of a statute, a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, a regulation adopted is not valid or effective unless consistent with the statute and reasonably necessary to carry out the purpose of the statute.

there is any need to reallocate these salmon among commercial fisheries.

As discussed in more detail below, the record indicates that there is a potential for a conservation problem if the Chignik bound sockeye are overharvested in the Shumagin fisheries. Additionally, the increase in fishing in the Shumagins threatens to disrupt the historical allocation of sockeye stocks. Further, the record indicates a need to implement conservation measures to help decrease harvesting of coho bound for Nushagak and Togiak. For the foregoing reasons we are persuaded that the regulation appears reasonably necessary to carry out the purposes of conservation and development of the fishery resources of the state. *See* AS 16.05.221(a).

## C. THE REGULATION IS NOT ARBITRARY

SSSNA argues that the Board's closure of the South Peninsula is based on speculative assumption and is contrary to the facts included in the record. It challenges each of the Board's objectives. Additionally, it asserts that the Board's decision is arbitrary because it failed to adequately consider the economic impact of the regulation.

The Board counters that *any one* of its objectives would suffice to make its adoption of the regulation reasonable. It additionally argues that the regulation is all the more reasonable because *each* of these goals necessitated the regulation. We agree.

1. The Board's finding that the regulation maximizes the pink and chum harvest is not arbitrary.

■ The post-June South Peninsula fisheries are managed for local pink and chum stocks, which are the major species produced in the South Peninsula streams. Nearly 10,-000,000 pink salmon were taken in those fisheries in 1991. Pink salmon runs usually arrive in strength about July 20 and peak about August 1. After mid-August, the quality of the pink salmon is usually poor. Chum salmon runs are more stable than pink salmon runs. The chum salmon runs begin earli-

er and last longer than the pink runs. However, after July 28, chum salmon quality in several terminal areas is poor because of discoloration. ADF & G historically has based fishing periods between July 6 and July 18 on the strength of chum salmon runs. It has based fishing periods between July 18 and August 20 on the strength of pink salmon runs.

SSSNA argues that the July 20 opening date does not "maximize" the catch of pink and chum salmon within the South Peninsula fisheries, including the Shumagin Islands, because many salmon are present and have been caught during the first three weeks of July. *See Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1261–62 (Alaska 1988) (equating "maximum" number with the "highest" number). It argues the Board selected the July 20 date to provide SSSNA the opportunity to catch as many fish as the Board deemed compatible with its other objectives. SSSNA concludes that because the regulation does not "maximize" harvests of pink and chum salmon, it is arbitrary.

CSA counters that numerous statements made by the Board during its deliberations demonstrate that the Board's clear intent was to "optimize," not "maximize" pink and chum harvest in the Shumagins consistent with its other goals. CSA concludes that the Board's finding arguably may be inarticulate, but that the mere use of the word "maximize" does not invalidate 5 AAC 09.366. We agree.

CSA's summation of the Board's intent mirrors the Board's deliberations. The Board was struggling with balancing the objectives of conservation and allocation of sockeye and cohos with its concern about how later opening dates would affect lost harvest opportunities for the targeted species of local pinks and chums, the possibility that early and/or heavy runs of pink salmon might create problems with poor fish quality, and processor capacity to handle the amount of fish harvested under such circumstances. The following comments, made during the Board's deliberations,[6] demonstrate its concerns.

Board Member Edfelt said:

6. The transcript of the Board proceedings ap-

pears to contain numerous grammatical, spell-

[T]he July 20th date here is directed to permit the full utilization of the pink salmon, and including and allowing a time to harvest bright [high quality] pinks and yet it still *minimizes the interception of migrating* coho stocks while tending to stabilize the existing allocations of sockeye salmon. In my view, July 20th is the best compromise date, given all the factors we have had to consider on this proposal.

As I see it here, [what] we're trying to do here is develop a plan that would maximize the full utilization of pink and chum salmon. Stabilize the allocation of sockeye salmon that has evolved over a long period of time and minimize the interception of *migrating coho salmon of unknown origin.* Three things. Can you [the Department] see any better or additional way to do that than what we've got before us here in the form of proposal 117B?

Board Member Carlyle commented:

Let me add one more thing. At the same time looking at—fully realizing that if we're gonna' harvest the pink salmon stocks, we're not gonna' completely eliminate other stocks being harvested. But, when I looked back and tried to minimize other stocks and still allow the full utilization of the pink salmon stocks, when you take into consideration processing capacities and so on, this [the July 20 opening date] just seemed like a fair compromise.

Board Member Lyons noted:

Mr. Chairman, in taking this action, as a Board member, I am trying to construct a fishery which is directed on pink and chum salmon stocks but acknowledges the fact that other stocks run in the region and can be harvested.

The record indicates that the Board was not intending to equate "maximize" with "the highest number." As stated by CSA, the Board appears to have intended to optimize rather than maximize the pink and chum harvest to the best of its ability, taking into consideration the other complex, but inherently interrelated problems such as allocation, conservation and biological concerns. The Board's choice of the word "maximize" rather than "optimize" does not render the regulation arbitrary.

2. The Board's objective of minimizing the interception of migrating sockeye bound for other areas, including Chignik, was not arbitrary.[7]

[redacted] The post-June sockeye catch in the Shumagin Islands has in recent years increased substantially. For example, the average sockeye catch for 1980–85 was 105,723 salmon, while the average catch since 1986 has been 356,435 salmon.[8] This increase is

ing, and transcription errors. We have decided not to identify the errors with the usual "sic" notation.

7. The Board asserts that it incorporated by reference concerns raised by proposal 115A into its deliberations on proposal 117. Consequently, a proper analysis of its deliberations on proposal 117 cannot be accomplished without reference to proposal 115A. The Board stated:

> Although 115A was ultimately voted down, the Board's discussions regarding allocation and conservation of Chignik bound sockeye intercepted in the post-June fishery relevant to proposal 115A were equally relevant to its actions regarding proposal 117, which also asked that the Board restrict fishing time in the post-June fishery. Because proposal 117 raised similar issues with respect to allocation and conservation of Chignik sockeye, the Board correctly references its previous deliberations on 115A and incorporated them by reference when it adopted proposal 117. The Board often references earlier deliberations when voting on a later proposal, since a complete duplication of deliberations would be a waste of time and expense, and in this case those previous *deliberations had just occurred.*

SSSNA does not dispute that the two proposals were intertwined. In fact, it also refers to comments made during the deliberations surrounding proposal 115A in its brief.

8. "The 1986–91 Shumagin Islands Section catch averages about 345,000 sockeye salmon, which is about 70% more than the expected local stock production from the South Peninsula systems.... South Peninsula sockeye systems, in aggregate, do not produce enough sockeye salmon to account for the catch currently occurring in the Shumagin Islands fishery." James N. McCullough & Mark E. Stopha, Alaska Department of Fish and Game, South Alaska Peninsula Post June Salmon Fishery, 1991 Report to the Alaska Board of Fisheries, copy of overhead entitled "South Peninsula Stocks—Are the Local Stocks Not Abundant Enough to Account for the Post-June Shumagin Islands Section Catch?" (1991).

attributed to a combination of several factors including additional fishing effort [9] and greater fish availability from increased salmon abundance.[10]

SSSNA argues that there is no evidence that the increase in the sockeyes caught in the South Peninsula fisheries, including the Shumagin Islands, was having any impact on catches in any other fishery, including Chignik fisheries. Likewise, SSSNA contends that the Board had no factual basis for predicting how closing the Shumagin Islands and South Peninsula fisheries would affect any particular fishery including the Western Alaska and Upper Cook Inlet fisheries. Therefore, SSSNA concludes that closure of the South Peninsula fisheries, including the Shumagin Islands, based on sockeye allocation and conservation reasons is arbitrary.[11]

Within the Shumagin Islands eighty percent or 276,000 of the average 345,000 post-June sockeye catch occurs in July. ADF & G affirmatively informed the Board that the Shumagin Islands fisheries intercept migrating sockeye bound for other areas, including Chignik, in the month of July.[12] The Board was also aware that as much as eighty percent of the sockeye caught in portions of the Southeastern District Mainland Fisheries through July 25 have been determined to be bound for Chignik.[13] Additionally, a 1987 tagging study suggested that approximately eighteen and a half percent of the sockeye present in this fishery during June are Chignik-bound sockeye.[14] ADF & G could not, however, on the basis of the tagging study, confirm an exact amount of Chignik sockeye present later during July but noted that there was the potential for a conservation problem if this stock was overharvested in this intercept fishery.[15] Therefore, although ADF & G considered proposal 115A as primarily a sockeye allocation issue, it was also aware of conservation concerns.[16]

SSSNA contends that the Board's reliance on the 1987 tagging study and on the rationale that stock composition in the Shumagin Islands fisheries is comparable to the composition found in the mainland fisheries are merely post hoc rationalizations offered by the Board's counsel. *See National Labor Relations Bd. v. Indianapolis Mack Sales & Serv., Inc.*, 802 F.2d 280, 285 (7th Cir.1986) ("An administrative agency's decisions ... cannot be sustained on a ground appearing in the record to which the agency made no

9. The increase in effort has two causes. First, as South Peninsula fisheries became more competitive, many multiple permit holders opted to sell their set gill net permit, while retaining their drift gill net or purse seine permit. Additionally, as a result of the decrease in the amount of fishing time available in other lucrative fisheries, such as the Southeast District Mainland fishery, the majority of set gill net fishermen moved to the Shumagin Islands Section to fish.

10. Data indicates that in recent years there has been a substantial increase in the sockeye catch in Bristol Bay, North Peninsula, Chignik, Kodiak, and Cook Inlet.

11. SSSNA acknowledges that the majority of the sockeye salmon caught in the South Peninsula and the Shumagin Islands are bound for other areas. However, SSSNA correctly states that because these fish are bound for various management areas, it is likely that the catches are a mixture of stocks and it is unknown whether the contribution of each stock changes from year to year.

12. ADF & G information indicated that there are two runs of sockeye through this fishery that are headed to Chignik. The first, or early run, goes to Black Lake and passes through this fishery beginning in late May, peaks in late June and dwindles in the beginning of July. The second, or late run, goes to Chignik Lake and appears near the end of June, peaks around July 20, but goes well into September when it finally tails off.

13. These areas are already included in the Southeastern District Salmon Management Plan. 5 AAC 09.360.

14. The Board acknowledges that the eighteen and a half intercept figure is only based upon one year's tagging data and represents a mathematical expansion. However, it argues that this was the best available scientific evidence it had.

15. An ADF & G staff member stated:

Is there a potential that [the] Chignik ... late run could come in weak and we could do damage [in Chignik, Kodiak, Cook Inlet fisheries]? Is that potential there? Yes, that potential is there. But we can't bona fie it, because we don't know the composition, as far as the volume of each one of those stocks represented in that area over time.

16. For example, Board Member Elias stated: "I think we do have a problem with sockeye.... And I'm going to err on the side of conservation...."

reference; ... the Board's decision stands or falls on its express findings and reasoning."). It argues that the tagging study was merely mentioned in passing in an ADF & G report. Additionally, SSSNA correctly contends that the studies showed that, unlike the situation in the Southeastern District Mainland sections, Chignik sockeye salmon do not dominate Shumagin Islands catches.

> If Chignik was the dominant stock contributing to the Shumagin Islands fishery the age composition should be more similar between the areas. Since differences occur in the age composition between the two fisheries, stocks in addition to Chignik must be contributing to the Shumagin Islands fishery.

Therefore, SSSNA argues that even if the Board did consider these factors, they do not support its decision requiring closure of the Shumagin Islands. Finally, SSSNA points to various Board comments indicating the Board's recognition of the limited information it had to consider. For example, Chairman Martin stated:

> We absolutely have no idea whose fish these are.... And by closing this fishery and closing—or plugging—or sticking your hand in the dike—then by moving it to the other areas—you know, putting a crack in the wall? What are we going to be impacting then, in the sockeye and in the coho and in all the other fisheries that are involved? Are we going to be more of a detriment to the local stocks? Are we going to be impacting another sockeye system that hasn't been historically affected? I don't know. And it seems to me that that's almost blind management.

CSA correctly counters that there is no statutory or common law requirement that ADF & G must conduct a costly tagging study before the Board can conserve or allocate salmon. The Board was told by staff that Chignik salmon "are certainly present in [the Shumagin Islands] during the month of July." CSA concludes that "[r]egardless of their relative proportions, each sockeye stock present in the Shumagins in July is jeopardized by the Stepovak set netters...." CSA correctly asserts that judging the adequacy of inherently limited fisheries data as well as the conservation benefits of limiting mixed stock intercept fisheries is within the scope of the Board's discretion. It concludes that courts are ill-equipped to second-guess the Board's expertise.

Indeed, comments from the agency's proceedings indicate that Board members relied on their own expertise in addition to information presented by ADF & G to assist them in formulating their conclusions regarding the proposals.[17]

Board Member Edfelt said:

> I believe the vast increase in effort in the west Unga and Nagai [of the Shumagin Islands] fisheries and the resultant sharp increase in sockeye catches, causes a major disruption in the allocation and therefore, upsets the historical utilization of sockeye stocks in other fisheries. And so, I'm opposed to upsetting the allocation between areas K[Kodiak] and L[Chignik] and M[South Peninsula and Aleutian Islands]....

Board Member Elias stated:

> I think we do have a problem with sockeye.... I'm looking at the numbers. In the timeframe that this management plan proposes and the increased effort that been out there. We have a problem, I think. And I'm going to air on the side of conservation on this one and be conservative and I am going to be voting in favor of proposal 115A, because I think that there is some basis for the factor that something is happening and I don't think we have a real handle on what it is but I don't want it to get out of hand either. I feel that there is a sockeye problem here from looking at what the Department has presented us.

We acknowledge that the exact composition of Chignik bound sockeye is unknown. However, ADF & G did confirm that Chignik bound sockeye are present in the Shumagins

---

17. SSSNA acknowledges that the Board is not limited to the record and may apply its expertise. However, it asserts that the Board cannot use is expertise as a cloak for fiat judgments. *See, e.g.,* *Tennessee Gas Pipeline v. Federal Energy Regulatory Comm'n,* 926 F.2d 1206, 1211 (D.C.Cir. 1991).

in July. There was also evidence presented that there has been an increase in effort in the sockeye harvest in July. Additionally, studies showed that South Peninsula sockeye systems, in aggregate, do not produce enough sockeye salmon to account for the catch currently occurring in the Shumagin Islands fishery. It was reasonable to conclude that there has been a shift in allocation. Furthermore, budget constraints do not always allow for costly tagging studies. The Board's finding that the closure was necessary for conservation and allocation reasons was not arbitrary.

3. The Board's objective of minimizing the interception of migrating coho salmon bound for other areas (which may include Nushagak and Togiak areas) for conservation reasons was not arbitrary.

■ The average South Peninsula fisheries annual post-June coho catch from 1978–1991 was 268,300. In 1991, 320,336 coho were harvested in the post-June South Peninsula fisheries. The Shumagin Islands section of the Southeastern District accounted for forty-six percent of the total 1991 post-June coho harvest despite having been closed to purse seiners due to the presence of immature salmon. It is conceded that most of the coho harvested in South Peninsula waters from July through mid-August are bound for other areas.

In connection with proposal 117, ADF & G reviewed the status of all Western and Central Alaska coho salmon stocks from Norton Sound to Upper Cook Inlet. It reported that "[c]atches are at or near historical maximum levels in all areas except the Nushagak and Togiak Districts, Bristol Bay." The Board was concerned with the conservation and allocation of Togiak and Nushagak coho. Its findings state that "[a]fter careful consideration of available run timing data" it chose to delay the opening of specified fisheries until July 20.

SSSNA argues that the author of the run-timing study relied upon by the Board specifically cautioned the Board not to use the run-timing data to "estimate the specific magnitude of stock composition and [that] great caution should be exercised in attributing actual interception of particular stocks to the respective degree of coincidence in calculated timing and timing of catches in the South Peninsula areas."[18] SSSNA argues that the incidence of and the amount of Nushagak and Togiak Bay coho caught in the South Peninsula fisheries, including the Shumagin Islands, is unknown.[19] Therefore, it contends that the Board's closure decision is arbitrary as there is no rational connection between the closure and the conservation problems being experienced in these areas.

The Board acknowledges that ADF & G's information was inconclusive. However, it asserts that it chose to take a more conservative approach to the issue to insure sustained yield of Nushagak and Togiak cohos. The following comments, made by various Board members, are examples of the Board's deliberations concerning coho conservation.

Board Member Samuelson said:

I'll be voting for the amendment 117B, although its not my ideal, sometimes a person's just got to accept things the way

18. The study concluded that "it is highly likely that catches in the South Peninsula areas are a complex mixture of stocks, and potential exists for all western and central Alaska coho stocks to contribute to coho catches in these areas."

19. Three of the six Board members who voted for the regulation conceded that the information provided by the ADF & G did not establish a direct link between the Shumagin Islands post-June fishery and the low catches in Nushagak and Togiak Bays. Board member Edfelt stated: "Most of the support that I've heard for the July 23rd date presupposes a direct link between the south Peninsula coho harvests and coho conservation concerns in Bristol Bay and other north-

ern areas and, in my view, that link has not been directly established; only suspected." Board member Samuelson stated: "I can't honestly tell the Board and the people here what percentage of these two river systems is being effecting— these two river systems. But, I know, in light of conservation that drastic steps sometimes need to be taken and if we wait for all biological data, I think we'd be waiting a long time, because of funding, budget cuts." The Board Chairman stated: "Now, there has been nothing that staff has said that shows me that there's a link between cohos in this area and cohos in the Bristol Bay/Nushagak areas, where they're having a conservation problem."

they are. What with me voting for 117B, I want the directive to reflect that my opinions are just as strong for the conservation concerns in the "nush" [Nushagak] and Togiak. Nushagak is by far, probably, one of the largest silver [coho] producers in the state of Alaska. 10 years ago we had an average commercial catch of 200 and some thousand fish. Its down to 5,000 now. When you have a system that's—that could produce the kind of fish—and I have the intimate knowledge of it—of that type of river system—and to watch it die, especially when you're from the area, its kind of painful. But, I'll go along with the wishes of the Board. The tagging study didn't indicate where these coho were migrating to. I can't honestly tell the Board and the people here what percentage of these two river systems is being effect[ed]—these two river systems [Nushagak & Togiak]. But, I know, in light of conservation that drastic steps sometimes need to be taken and if we wait for all biological data, I think we'd be waiting a long time, because of funding, budget cuts. The state operates off a non-renewable resource, which is oil, which is drying up, so. You know, its kind of a little lecture, here, but since I am from the area, I've got some real strong feelings—the intimate knowledge I have of that river system. So, I'll be supporting 117B; the amendment.

Board Member Elias said:

I will also be in support of 117B. Mr. Samuelson was fairly eloquent in his deliberation and telling you his justification of why, obviously they said the Department didn't establish a link and the perception is that there may not be that. Well, my perception is that these coho stocks do migrate up there [to the Nushagak & Togiak], and so, therefore, I have very strong feelings that way. But, again, that doesn't mean that I'm happy with 117B as the solution. But, lets put it this way. If you've got a banana, and you can't have the whole banana, you might as well accept that bite and wait for the next time around.

We agree with the Board that although ADF & G could not confirm that coho bound for the Nushagak and Togiak areas are being intercepted in this fishery, the Board's conservation concerns for coho were legitimate. Therefore, the Board's objective of minimizing the interception of migrating coho was not arbitrary.

4. The Board's objective of minimizing the interception of immature sockeye and chum salmon was not arbitrary.

SSSNA contends that because the Board's findings do not mention immature salmon as a basis for the regulation, the Board cannot now rely on that fact as a justification for the closure. Additionally, SSSNA correctly asserts that only the purse seine net fleet harvests immature salmon. The drift gillnetters and set gillnetters do not create a problem for immature salmon presently because of the relatively large mesh size of their gill net gear. Therefore, it concludes that because the closure included all three gear types rather than just the purse seine fleet, the goal of preventing the catch of immature salmon would be arbitrary.

Although the concern with immature salmon was not included in the Board's findings, the Board did consider this problem during its deliberations and Chairman Martin made reference to the decreased harvest of immature salmon as one of the four benefits to be gained by the regulation. The Board was presented with information evidencing biological and conservation concerns for the immature sockeye and chum salmon that were being caught. It was informed that in 1989–91 the Shumagin Islands had been closed to purse seiners in July due to the presence of immature salmon. It was also informed that most of the immature salmon have left the area by the 20th of July. Therefore, the Board asserts that it reasonably concluded that after July 20, those utilizing this fishery would not harvest many immature sockeye or chum salmon.[20]

20. The regulation proposed delaying until July 20, the opening of the Shumagin Island fishery of the Southeastern District, portions of the Southwestern District and the Unimak District. The harvest of immature salmon has been a problem in each of these areas.

The Board acknowledges that it is the purse seine fleet rather than the set net fleet that presents a problem with harvesting immature salmon. However, it argues that this fact does not affect the reasonableness of the regulation. The Board contends that it took pains to avoid reallocation of fish among gear types within this fishery, as well as between fisheries. By doing so, the Board claims it sought to restore allocation to historical levels. Because the opening dates applied to all three gear types, it concludes that it was able to address biological and conservation concerns about harvesting immature sockeye and chum before July 20, as well as the preservation of historic allocations.

SSSNA counters that the Board did not consider reallocation of gear types. SSSNA is correct that the Board did not make specific statements regarding allocation among gear types during its deliberations. However, the committee consisting of a few Board members, organized to help the Board on proposal 117, mentioned its concern regarding allocation among gear types. It expressed its expectation that the Board would eliminate gear conflicts that might result from any action taken on proposal 117.

Additionally, CSA correctly argues that the regulation need not be perfect to be reasonable. *Gilbert v. State, Dep't of Fish and Game*, 803 P.2d 391, 397 (Alaska 1990).

> It is not necessarily a valid objection to [an administrator's] choice of a standard by means of a regulation that another choice could reasonably have been made, that experts disagreed over the desirability of a particular standard, and that some other method of regulation would have accomplished the same purpose and would have been less onerous. It is enough that the administrator has acted within the statutory bounds of his or her authority, and that the choice among possible alternatives adapted to the statutory end is one which a rational person could have made.

2 Am.Jur.2d *Administrative Law* § 230 (1994).

Although the Board did not discuss in detail its concern of reallocation among gear types, it was aware of this concern and mentioned allocation throughout its deliberations.

Therefore, the objective of preventing the harvesting of immature salmon was not arbitrary.

5. The Board gave adequate consideration to the economic impact of the proposed regulation.

Alaska Statute 16.05.251(e) was designed in part to reaffirm the regulatory authority of the Board to allocate resources among fisheries and to provide criteria by which allocative decisions are to be made. *Peninsula Marketing Ass'n v. State*, 817 P.2d 917, 921 (Alaska 1991). This court has previously held that 16.05.251(e) applies to allocations made between commercial fisheries. *Id.* Alaska Statute 16.05.251(e) identifies seven factors that may be considered by the Board in making allocation decisions:

> (1) the history of each personal use, sport, guided sport, and commercial fishery;

> (2) the number of residents and nonresidents who have participated in each fishery in the past and the number of residents and nonresidents who can reasonably be expected to participate in the future;

> (3) the importance of each fishery for providing residents the opportunity to obtain fish for personal and family consumption;

> (4) the availability of alternative fisheries resources;

> (5) the importance of each fishery to the economy of the state;

> (6) the importance of each fishery to the economy of the region and local area in which the fishery is located;

> (7) the importance of each fishery in providing recreational opportunities for residents and nonresidents.

SSSNA contends that although several Board members stated on the record that it considered the criteria, the Board never articulated how the factors were applied to the particular regulation in order to reach its decision. Specifically, SSSNA argues that the Board failed to evaluate (1) the importance of the fisheries to the economy of the

state and to the region and locality where each fishery exists, (2) the economic impact the closure would have on the incomes of South Peninsula fishers, and (3) the economic benefits which would be obtained by any other fishers in the state. SSSNA concludes that while an agency does not need to address every single factor, the failure to consider obvious and important factors makes its decision arbitrary. *See, e.g., Southeast Alaska Conservation Council, Inc. v. State,* 665 P.2d 544, 549 (Alaska 1983).

The Board was not presented with economic reports or studies concerning the impacted fisheries or the regions and localities in which they are located. However, the Board did hear testimony from local fishers who testified about the availability or lack of availability of financially comparable alternative areas to fish during the closure period. The Board also heard from a fish processor, who testified that processor's workers might be idled as a result of the closure. The Board did consider each of the seven allocation criteria for sockeye salmon with proposal 115A. As discussed earlier, because the Board incorporated its previous deliberations on proposal 115A into proposal 117, the Board properly addressed the allocation criteria for sockeye salmon with proposal 117.

Board member Edfelt specifically addressed each of the AS 16.05.251(e) criteria as follows:

To me the main issue here is allocation.... The Board has dealt ... with a lot of different allocation issues regarding sockeye salmon and these south Peninsula fisheries. Its been happening ever since sockeye salmon were first caught. It was several years ago that the southeastern district salmon management plan [5 AAC 09.360] was crafted to plug the hole in the dike as far as interception of fish bound for other areas where they were already being almost fully utilized. And it seems like the history of the Board effort in this area has been to maintain the balance in the allocation between these various areas. And sometimes when you plug the dike in one spot the leak comes out in another, and I think what we have to do here is to, again, get the allocation distribution back to what

it used to be before. And for that reason I'm going to run through the criteria. [1] I think there isn't a sockeye fishery in the state that doesn't have a long history of full utilization. And, I think its only recently, in a non-historical way, that the sockeye catch in the Shumagin Islands has dramatically increased. And, therefore, the historical utilization in other areas has been adversely affected. [2] As far as the number of participants in the fishery— there also seems to be an increase in effort in the south Peninsula fishery and a fairly stable effort in Chignik and Kodiak and the other places where these fish may be migrating to. [3] Certainly, the importance of a fishery is very great in all of the areas where sockeye stocks are taken commercially. Its the number one money fish, price-wise. [4] I do believe that there's an availability of alternative resources in the south Peninsula area. Most of the stocks that are caught in the Shumagin Islands area are migrating to other areas within the management area or outside the management area and there are other locations within the management area that are available to harvest. [5 & 6] Both fisheries are important to the economy of the region and the economy of the state, and the economy of the local area. [7] And I don't see where any recreational opportunities are affected for anyone. It goes, though, that that's the application of the criteria as I see it, and I don't have anything further to offer.

Board member Hansen also stated that he "went through the seven criteria." Additionally, Chairman Martin also gave an analysis of how proposal 115A was affected by each of the seven criteria. Chairman Martin stated:

Looking at the seven criteria. I'll just go down and read them: [1] the history of each commercial fishery—well, they both have a long standing history. [2] The number of participants that have participated in each fishery, or can reasonably be expected to participate in the future—well, I think in both areas, they're going to be able to continue participating, so there's no difference in my mind. [3] Importance of each fishery for providing residents an opportunity to take fish for personal family

consumption—I don't think it applies. [4] The availability of alternative fisheries resources—well, I guess, there's an alternative for the Shumagin or the area M fishermen, I just don't know whose fisheries resources they are. The Chignik fisheries, I think that's pretty apparent. [5 & 6] The importance of each fishery to the economy of the region and local area where the fishery is located—in my mind, this is an important factor. I think that you can look at this fisheries on the Shumagins and the Popoff Island area and that fishery has been around probably since anyone started fishing there. And if we think about it and apply it to local knowledge on how fisheries develop around communities—I don't see how this community would be any different than any other community as far as their development. [7] And number seven doesn't apply.

The Board asserts that with respect to the coho, ADF & G could not identify the stock composition for coho intercepted in the post-June fishery, and therefore, it did not need to consider the allocation criteria because allocation, if any, was unknown. However, it asserts that based on the assumption that there must be some allocative effect, it referenced and discussed the allocation criteria for coho.

Specifically, both Board Member Edfelt and Chairman Martin made references to the fact that the Board considered the "criteria" during proposal 117 deliberations.[21] Additionally, the Board argues that it considered information from ADF & G and the public as well as testimony requested by the Board during deliberations concerning many of the factors contained in the allocation criteria.

We conclude that the Board did adequately consider the allocative criteria. There is no requirement that the Board consider detailed documents establishing exact amounts of money that will be lost or gained in their allocative decisions. The Board understood that any fishery is important to the community in which it is located. Additionally, it heard testimony from fishers and processors who explained, in general terms, how they would be impacted financially. It was aware of the applicable allocative criteria and adequately addressed each one.

**D. APPELLATE REVIEW OF THE BOARD'S DECISION IS NOT LIMITED TO ITS DECISIONAL DOCUMENT**

SSSNA argues that because the Board elected to issue a decisional document, appellate review must focus completely on the Board's written findings. *See Southeast Alaska Conservation Council,* 665 P.2d at 549 ("If the document [contains] an inadequate reasoned explanation, the court [is] authorized to remand it to the agency for supplementation instead of conducting a trial."). SSSNA claims that the Board's decisional document is inadequate because it fails to explain how the Board applied the applicable statutory factors or reached its ultimate factual conclusions. It concludes that the regulation must be remanded to the Board. In the alternative, SSSNA argues that even if this court considers the Board's proceedings in addition to its decisional document, the regulation is still invalid because the record does not explain the Board's rationale on several critical issues.[22] *Alaska Fish*

---

21. Chairman Martin said:

> It is your opportunity, from each gear group, to come up here and give us the facts that you have come up which will help us to better understand one of our criteria in the Board process.

> Board Member Edfelt argued:

> [T]his displacement thing that we're talking about has to do with the criteria regarding the availability of alternative fisheries resources. And I think I'd like to hear some information, too, from the processing industry as well as the fishermen, as to any displacement effects that might affect them.

22. SSSNA contends that the following points were not adequately explained: (1) which fisheries the Board intended to allocate fish to upon closure of the South Peninsula fisheries and which terminal fisheries were at risk of overharvesting; (2) why increased catches in the Shumagin Islands created a need for conservation or allocation; (3) why preventing the catch of sockeye salmon post-June in the Shumagin Islands and South Peninsula fisheries would address the objectives of maintaining historical allocations or overharvesting of sockeye salmon in Chignik or other management areas; (4) why interception of coho salmon in the Shumagin Islands and other South Peninsula fisheries is related to low

*Spotters Ass'n v. State, Dep't of Fish and Game*, 838 P.2d 798, 801 (Alaska 1992) ("[I]t is vital that the agency clearly voice the grounds upon which the regulation was based in its discussions of the regulation or in a document articulating its decision.") (citations omitted).

The Board correctly counters that this court is not restricted to reviewing its action based on a two-page written summary. Rather, its action should be judged on the record as a whole. Just recently this court stated:

> We have expressly held that decisional documents are not required in the circumstances where an agency exercises it rulemaking powers. *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1260–61 (Alaska 1988); *see also State v. Hebert*, 743 P.2d 392, 396–97 (Alaska App. 1987). We are not persuaded that we should modify *Johns* to require a decisional document from an administrative agency when it exercises its (quasi-legislative) rulemaking authority. As noted in the previous section, the record in this case indicates that the Board took a hard look at the relevant and often competing salient factors in making its allocation decision and that its decision reflects reasoned decisionmaking. Adoption of a decisional document requirement is unnecessary and would impose significant burdens upon the Board.

*Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1319 (Alaska 1994).

Just because the Board chose to go the extra mile and draft and adopt written findings, it should not be penalized by having this court forgo any inquiry into the record to ascertain whether it took a hard look at the salient factors. When a Board exercises its quasi-legislative authority, as it does when it enacts a regulation, the Board's findings are the "conceptual equivalent of a legislative committee report, which may be helpful in

catches experienced in the Nushagak and Togiak Districts; and (5) how the statutory allocation factors, and in particular consideration of the economic factors, were applied in the Board's final decision.

determining ... administrative intent...." *State v. Hebert*, 743 P.2d 392, 396 (Alaska App.1987). It appears that the Board adequately voiced the grounds upon which the regulation was based in its deliberations.

## E. THE REGULATION ALLOWS A FAIR AND REASONABLE OPPORTUNITY TO COMMERCIALLY FISH FOR SALMON

 Alaska Statute 16.05.251(d) provides that regulations adopted by the Board must, "consistent with sustained yield ... provide a fair and reasonable opportunity for the taking of fishery resources by personal use, sport, and commercial fishermen."

SSSNA argues that because AS 16.05.251(d) and (e) were enacted at the same time, each must be interpreted to create a harmonious whole. Therefore, it concludes that as applied to an allocation of fishery resources, to be fair, a regulation "may impose a hardship on one group" only when, under applicable criteria, "the hardship 'is outweighed by the total benefits received by another group or groups'." *C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1563 (D.C.Cir. 1991) (citing language from 50 C.F.R. § 602.14(c)(3)(i)(B)). It contends that the record does not demonstrate that the hardship that it will incur by closure is outweighed by the benefits that will be received by any other group(s). Therefore, it concludes that the regulation does not provide a fair opportunity for it to harvest sockeye salmon.[23]

SSSNA is correct that the Board did not attempt to do a specific cost/benefit analysis. It would be very difficult to place a specific monetary value on the benefits resulting from this regulation. For example, it is difficult to put a price tag on conservation benefits. Additionally, management of a fishery resource is not an exact science. There is much speculation involved. The exact composition of each stock involved in this regula-

23. CSA counters that SSSNA is still free to "prospect" in other parts of Statistical Area M open to set net fishing. Additionally, the Board heard much testimony from ADF & G as well as fishers as to the availability of alternative fishing sites.

tion was unknown as was the potential fluctuation in stock composition from year to year. The Board appeared to balance the concerns of many groups in adopting this regulation. It was aware of the concerns of the set netters and processors in the Shumagin Islands as well as the fishers in Nushagak and Chignik. It attempted to allow as much fishing time to harvest targeted pinks and chums as it could, consistent with its allocation and conservation concerns. Therefore, we conclude that the regulation does not unnecessarily deprive any group of the fair and reasonable opportunity to fish.

### F. ATTORNEY'S FEES

 Because the superior court properly held that the regulation is valid, the State and CSA are the prevailing parties. The superior court properly awarded attorney's fees, and that award should stand.[24] Alaska R.Civ.P. 82.

### III. CONCLUSION

Title 5, section 09.366 of the Alaska Administrative Code is consistent with and reasonably necessary for purposes of conservation and development. It is not arbitrary and is supported by reasonable objectives. Adequate consideration was given to all relevant criteria. The Board's deliberation demonstrates that it took a hard look at the salient factors and engaged in reasoned decision making. This court has "no authority to substitute [its] own judgment for the Board of Fisheries' particularly since highly specialized agency expertise is involved. The 'wisdom' of the regulation is not a subject of review." *Gilbert*, 803 P.2d at 397. This court realizes that fish biology and management are inexact sciences. Therefore, we AFFIRM the decision of the superior court upholding the validity of Title 5, section 09.366 of the Alaska Administrative Code, and awarding the State and CSA partial attorney's fees.

---

**24.** SSSNA does not challenge the reasonableness of the fee, only its award. Therefore, we do not consider the reasonableness of the fee awarded on appeal. *Oceanview Homeowners Ass'n, Inc. v.* *Quadrant Constr. & Eng'g*, 680 P.2d 793, 797 (Alaska 1984) ("an issue omitted from an appellant's statement of points on appeal will not be considered by this court").