**Kevin Howard FRANK, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8579.

Court of Appeals of Alaska.

Aug. 27, 2004.

Sharon Barr, Assistant Public Defender, Anchorage, J. Jake Ketscher, Assistant Public Defender, Kodiak, and Barbara K. Brink,

Public Defender, Anchorage, for the Appellant.

Marilyn J. Kamm, Assistant Attorney General, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Kevin Howard Frank is serving a life sentence for first-degree murder. (Frank's conviction and sentence were imposed under Alaska's pre–1980 criminal code.) In 2001, after serving more than 20 years of his sentence, Frank applied for discretionary parole. The Parole Board denied his application and ordered that he could not re-apply for parole until he had served another 10 years.

AS 33.16.130(c) declares that when the Alaska Parole Board denies a prisoner's application for discretionary parole, the Board "shall issue its decision in writing and [shall] provide the basis for [its] denial of discretionary parole". In Frank's case, the Parole Board issued its decision in a one-page form document that contains a checklist of nine generic reasons for denying parole; the Board checked off five of these reasons. We conclude that most of these five listed reasons are not sufficiently specific to comply with the statutory mandate that the Board "provide the basis" for its decision. We therefore direct the Board to give more specific reasons for its decision to deny Frank's application for discretionary parole.

### Underlying facts

In September 1979, Frank robbed a taxi driver and shot him to death. Following his arrest, Frank claimed that he had been in an alcoholic blackout and that he remembered nothing of these events. Despite this claim, Frank was convicted of first-degree murder (intentional homicide during the commission of a robbery).[1]

During the first 17 years of Frank's imprisonment, he abused alcohol and drugs, he was repeatedly disciplined for violating prison regulations, and he was involved in several incidents of violence. Then, beginning in 1997, Frank started to regularly attend the meetings of Alcoholics Anonymous. He took on a leadership role at the AA chapter in the Lemon Creek Correctional Facility, and he apparently stopped using drugs. (At the time of his parole hearing in August 2001, Frank had not had a "dirty" urinalysis since 1997.)

Frank also developed an ongoing relationship with a Juneau family through a prison visitation program. In addition, Frank developed skill (and some reputation) as a carver of Tlingit art. He taught carving workshops at Lemon Creek, and he sold some of his pieces, thus acquiring supporters outside the prison.

However, Frank's post–1997 conduct was not spotless. In 2000, Frank was disciplined for violating prison rules relating to outside bank accounts and the sale of prisoner-made artifacts. In addition, Frank was disciplined when a small home-made knife and two knife blades were discovered among his personal supplies in the wood carving shop. (It was forbidden for prisoners to make or possess their own knives.)

At about the same time that the knife and knife blades were discovered, a confidential informant told prison authorities that Frank had threatened to stab the Lemon Creek superintendent and a corrections sergeant. Frank was placed in administrative segregation while this allegation was investigated. He was released 30 days later, after corrections officials apparently concluded that the allegation was not substantiated.

In March 2001, Frank submitted his application for discretionary parole. His application included letters of support from members of the community, from members of his AA support group, and from the Haida Corporation. It also included certificates attest-

---

1. *See Gray v. State*, 463 P.2d 897, 902–03 (Alaska 1970) (explaining that, under Alaska's former criminal code, first-degree murder required proof that the killing was intentional, and that the killing was done either with premeditation or "by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary").

ing to his completion of prison education and therapy programs.

Pursuant to AS 33.16.110, Probation Officer Jeanne Fischer prepared a pre-parole report on Frank's offense and his institutional record and progress. Fischer reported that, under Department of Corrections guidelines, Frank should serve a minimum of 210 months (*i.e.*, 17½ years) before being released on discretionary parole. Although Frank had already served 243 months (*i.e.*, approximately 3 years more than the minimum imprisonment specified in the guidelines), Fischer recommended that Frank not be offered parole for another 19 years. In support of this recommendation, Fischer cited the seriousness of Frank's crimes, the questions surrounding his progress toward rehabilitation, and the potential risk to the public safety if he were released.

On August 14, 2001, the Parole Board heard Frank's application for parole. Both Frank and Fischer were present, and they answered questions from Board members.

One of the subjects raised at the hearing was the allegation that Frank had threatened to harm the prison superintendent. One particular Board member asked several questions about this incident. Frank denied that he had ever threatened the superintendent, and Officer Fischer explained that no evidence had been found to support the allegation, other than the confidential informant's initial tip. Fischer told the Board, "[Frank] stayed in seg[regation] until the superintendent felt comfortable and allowed [him] to go back into [the general] population. There really wasn't any more evidence that [Frank] did or did not make those threats." After listening to Frank's and Fischer's answers, the Board member stated that he "accept[ed] that, on the record".

Soon after the hearing adjourned, the Parole Board issued its written decision: they refused to release Frank on parole, and they ordered that Frank could not re-apply for parole until he had served another 10 years in prison.

Frank sought reconsideration of this decision, filing a lengthy written statement in which he asserted that Fischer, motivated by personal enmity toward him, had misrepresented his institutional record. The Board re-affirmed its previous decision (without amplifying the grounds for that decision).

### The Parole Board's written decision

The document issued by the Parole Board looks like this (with the text in italics representing the portions that were filled in by hand):

On *August 14* , 200 *1* the Alaska Board of Parole met in full session at *L.C.C.C.* .

Your application for discretionary parole was reviewed at that time and it was the Board's decision to ☐ **deny** your parole for the remainder of your sentence or ☒ **continue** you and have a review hearing *Fall – 2011*.

**The Board based this decision in part on the following indicated factors:**

☐ The guidelines in your case are to serve a minimum of _____ and you had served only _____ months on the guidelines at the time of your hearing.

☒ Aggravating factors are present which prompt the Board to go above the guidelines in denying your parole.

☐ Even upon serving the full term of your sentence, you would not have met the minimum of incarceration time to meet the discretionary parole guidelines of the Board.

☒ The Board noted the very serious nature of your crime and/or the history of violence and pattern of criminal behavior which your file presents, and have assessed that you are a high risk for criminal behavior or high risk to violate conditions in the future.

☒ The Board felt that additional time incarcerated before your release date would allow you more time to formulate a realistic and firmly based release plan.

☒ The Board felt that additional time incarcerated would allow you the possibility of taking advantage of treatment and/or training/education programs that are available within the institution.

☐ The Board has noted factors such as previous probation or parole violations, to include poor supervision record.

☒ The Board has noted factors regarding your institutional behavior. This may have included: major infractions, disciplinary actions, poor/no institutional work history, poor/no program participation, or criminal behavior during incarceration.

☐ The Board had substantial concerns about your release plan that was presented to them at the hearing.

☒ OTHER / COMMENTS: *Remain free of disciplinary action & receive psychological evaluation and follow the recommendations are the Board's expectation[s] before the next hearing.*

*Why we conclude that the Board's written decision does not satisfy the mandate of AS 33.16.130(c)*

 As we explained earlier in this opinion, AS 33.16.130(c) states that when the Parole Board denies a prisoner's application for discretionary parole, the Board "shall issue its decision in writing and [shall] provide the basis for [its] denial of discretionary parole". In other words, the Parole Board must specify the basis (or bases) for its decision in writing.

In the present case, the Board issued its decision in writing, but it is difficult to discern the basis for the Board's decision from that writing.

The written decision states that "aggravating factors are present which prompt[ed] the Board to go above the guidelines in denying [Frank's] parole". But the written decision fails to specify these factors.

The written decision also states that "[t]he Board felt that additional time [in prison] ... would allow [Frank] to formulate a realistic and firmly based release plan". But the Board did not specify the ways in which it believed that Frank's release plan was deficient. We note, in particular, that the Board did *not* check the box on the pre-printed form that says, "The Board had substantial concerns about [the] release plan that was presented to them at the hearing."

Next, the written decision states that "[t]he Board felt that additional time incarcerated would allow [Frank] the possibility of

taking advantage of treatment [or] training [or] education programs that are available within the institution." This is stated so generically that it amounts to a truism. If Frank remains in prison, he of course can take advantage of the programs offered there. But Frank presented evidence that he had completed several programs. The Board's written decision fails to specify what additional treatment, training, or education the Board believed was needed or advisable.

The written decision then states that "[t]he Board has noted factors regarding [Frank's] institutional behavior." Apparently, the Board concluded that these factors militated against parole release. However, the written decision does not specify the factors that the Board considered. Instead, the written decision states merely that "[these factors] *may have included* ... major infractions, disciplinary actions, poor [or] no institutional work history, poor [or] no program participation, or criminal behavior during incarceration".

It is hard to deduce what the Board is referring to here. Again, the written decision lists various factors, but then declares that the Board may not have relied on these listed factors in reaching its decision. The written decision states only that these listed factors "may have [been] included" among the facets of Frank's institutional behavior that the Board considered.

Even focusing on the listed factors, the basis of the Board's decision is not clear. For the four years preceding Frank's parole application, his institutional work history and program participation were apparently excellent. On the other hand, Frank apparently committed infractions and was subjected to disciplinary actions during his term of imprisonment, even during the same four years when his work history and program participation were good.

The Board's lack of specificity on this subject is particularly troubling because of the controversy surrounding Frank's alleged threat against the superintendent of Lemon Creek. As explained above, Frank was put into administrative segregation after a confidential informant alleged that Frank had threatened to stab the superin-

tendent. But Frank was released when Corrections authorities were unable to substantiate this allegation. At the parole hearing, Frank denied that he had threatened the superintendent, and Officer Fischer told the Parole Board that there was no evidence to support the allegation, beyond the informant's tip itself.

One of the Parole Board members apparently stated that he was satisfied that there was no proof that Frank had threatened the superintendent. But the other three members of the Board expressed no opinion on this issue. We have no way of knowing whether these other three members took a different view of the matter. And we note that the Board never declared that it would ignore the allegation when making its decision.

Finally, aside from the lack of specificity that we have identified in these various portions of the Board's written decision, we note that the entire checklist on the pre-printed form is introduced by the language, "The Board based [its] decision *in part* on the following ... factors". In other words, the Board's written decision clearly implies that the Board had other, completely unspecified reasons for denying Frank's parole application (and for prohibiting him from re-applying for another 10 years).

AS 33.16.130(c) requires the Board to specify the basis for its denial of discretionary parole. We construe this statutory mandate to mean that the Board must describe its reasons in sufficient detail that inmates can understand in what respects they have fallen short—so that inmates can guide their future behavior, and so that they can prepare more satisfactory future applications for parole. In addition, the Board must describe the reasons for its decision in sufficient detail to allow meaningful judicial review—so that reviewing courts can determine whether parole has been denied for an impermissible reason.

We acknowledge that, under 22 AAC 20.170(d), the Parole Board "is not required to make any findings of fact or conclusions of law regarding any item or document in an applicant's file nor relate them to the board's release criteria." This regulation appears to

be based on a passage from the United States Supreme Court's decision in *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979):

> [W]e find nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular "evidence" in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release. The Board communicates the reason for its denial as a guide to the inmate for his future behavior.... To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination.... [T]he parole-release decision is ..: essentially an experienced prediction based on a host of variables.... The Board's decision is much like a sentencing judge's choice ... to grant or deny probation following a judgment of guilt, a choice never thought to require more than what Nebraska now provides for the parole-release determination.... The Nebraska procedure affords [the inmate] an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole[.] The Constitution does not require more.

*Greenholtz*, 442 U.S. at 15–16, 99 S.Ct. at 2108.

To the extent that 22 AAC 20.170(d) embodies this rule—that is, to the extent that the regulation exempts the Parole Board from expressly resolving all of the issues of fact raised by the parole application, or from explaining how the Board viewed each piece of information or assessed its relevance to the parole decision—the regulation is a valid exercise of the executive branch's rule-making authority. But we must not interpret 22 AAC 20.170(d) as abrogating the Parole Board's statutory duty to explain the basis for its decision.

■ A regulation must be consistent with the statute it interprets or implements.[2] To the extent that a regulation is inconsistent with statutory law, the executive branch agency that promulgated the regulation has exceeded the rule-making power delegated by the legislature.[3] Thus, "when a regulation conflicts with a statute, it is the regulation that must yield." [4]

Accordingly, we conclude that 22 AAC 20.170(d) does not exempt the Parole Board from the duty imposed by AS 33.16.130(c)—the duty to specify its reasons for denying an application for discretionary parole.

The Board's written decision in Frank's case is not sufficiently specific to allow us to discern the reasons for the Board's decision, nor is it sufficiently specific to allow Frank to guide his future behavior or draft future parole applications that might satisfy the Board's concerns. The written decision therefore fails to comply with AS 33.16.130(c). As a consequence, we must direct the Board to issue a revised written decision, one that complies with the governing statute.

*Frank's other claims*

Frank contends that the Parole Board denied him due process of law by failing to adequately specify the grounds for its decision.[5] Because we have concluded that this same lack of specificity constituted a violation of AS 33.16.130(c), Frank's due process claim is moot.

**2.** *Vail v. Coffman Engineers, Inc.*, 778 P.2d 211, 214 (Alaska 1989).

**3.** *State v. Kenaitze Indian Tribe*, 83 P.3d 1060, 1064 (Alaska 2004); *Stepovak–Shumagin Set Net Ass'n v. State Board of Fisheries*, 886 P.2d 632, 636–37 (Alaska 1994); *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

**4.** *Gudmundson v. State*, 763 P.2d 1360, 1363 (Alaska App.1988). *Cf. Beran v. State*, 705 P.2d 1280, 1287–90 (Alaska App.1985) (discussing the requirement that a regulation, in order to be valid, must be consistent with statutes addressing the same subject matter).

**5.** *Compare Kiester v. Humana Hospital Alaska, Inc.*, 843 P.2d 1219, 1225 (Alaska 1992) ("[B]asic principles of due process of law require that when a hospital denies an application for privileges, it notifies the applicant of the specific criteria which were determinative in the denial and how the applicant failed to meet the hospital's expectations with regard to the criteria."); *Noden v. Commercial Fisheries Entry Comm'n*, 680 P.2d 493, 498 (Alaska 1984) (holding that an unsuccessful applicant for a fishing permit is

Frank raises several other issues in this appeal.

■ Frank contends that current Alaska parole law violates the Alaska Constitution's guarantee of due process of law because prisoners have no right to call witnesses on their behalf at parole application hearings, and because indigent prisoners have no right to counsel at public expense to represent them in these hearings. These contentions were not raised in Frank's petition for post-conviction relief.

■ Frank also contends that the Parole Board violated his right to due process by relying on information obtained from an un-identified confidential informant, without allowing Frank to confront this informant. This claim was likewise not raised in Frank's petition for post-conviction relief.

Frank asserts that the Parole Board failed to consider the goals of penal administration set forth in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970), and now codified in AS 12.55.005. While these goals govern sentencing in criminal cases, it is not clear to us that the *Chaney* goals govern the Parole Board's decision to grant early discretionary release to a sentenced prisoner. In any event, these goals appear to be encompassed by AS 33.16.100(a) and 22 AAC 20.335(c).[6] And finally, this claim, too, was not raised in Frank's petition for post-conviction relief.

entitled to an explanation of "the particular grounds" for the Commission's decision to deny the application).

**6.** AS 33.16.100(a) states:

The board may authorize the release of a prisoner on discretionary parole if it determines a reasonable probability exists that

(1) the prisoner will live and remain at liberty without violating any laws or conditions imposed by the board;

(2) the prisoner's rehabilitation and reintegration into society will be furthered by release on parole;

(3) the prisoner will not pose a threat of harm to the public if released on parole; and

(4) release of the prisoner on parole would not diminish the seriousness of the crime.

22 AAC 20.165(c) states:

When considering an application for parole, the board will, in its discretion, consider any of the following factors [, and] will determine the priority and weight to be given each factor when making a parole release decision:

(1) the applicant's readiness and willingness to face obligations in the community and to undertake normal responsibilities;

(2) the current circumstances of the applicant's family, how the family views the applicant, its interest and readiness to accept the applicant back as part of the family, and its supportiveness of the applicant's release;

(3) the circumstances regarding the proposed residence, including the home, neighborhood, and community in which the applicant will reside;

(4) the applicant's employment history and vocational and academic skills in determining the applicant's employability;

(5) the availability of family and other community resources to assist the applicant if released on parole;

(6) other factors regarding the applicant's parole plan;

(7) the institutional conduct of the applicant such as behavioral adjustment, involvement in institutional programs, benefits of treatment, relationship to the staff, and how these might relate to the applicant's adjustment in the community;

(8) information about the applicant's use or abuse of any drugs or of alcoholic beverages, the extent of the use or abuse, and relationship to the applicant's behavior, criminal behavior, and current offense;

(9) previous involvement in any treatment programs and the applicant's subsequent behavior after exposure to such treatment;

(10) relevant information from the sentencing judge, the prosecutor, the defense attorney, and the victim;

(11) previous probation or parole experiences, behavior when out of custody on bail, bond or own recognizance release, pretrial diversion, deferred prosecutions, furlough, and the recency of these experiences;

(12) the applicant's willingness to discuss information the board considers relevant, the applicant's willingness to accept responsibility for his or her criminal activity, remorse expressed, and the applicant's truthfulness with the board;

(13) noticeable changes in the applicant, the applicant's behavior, self concept, attitude toward the offense, perceived thinking errors, understanding of causal factors, and understanding of the need for change;

(14) information regarding the applicant's lifestyle, productivity, and previous assaultive behavior or other antisocial behavior in the community;

(15) the physical and emotional condition of the applicant including reports from medical personnel, mental health personnel, or treatment personnel;

(16) the applicant's attitudes, including concern for other people;

(17) letters, petitions, or other information from persons, groups, or agencies recommend-

Accordingly, we decline to address these points further.

*Conclusion*

Because the Parole Board's written decision lacks the specificity required by AS 33.16.130(c), we direct the Parole Board to issue a revised decision which adequately explains its reasons for denying Frank's application for parole. After the Board issues its revised decision, Frank may re-open his petition for post-conviction relief.

We do not retain jurisdiction over this case.

ing that the applicant be or not be paroled, and the basis for these recommendations;

(18) the applicant's perceived willingness and ability to abide by any standard or supplemental conditions of parole;

(19) the relationship between the applicant's crime, length of sentence, background, and the board's handling of similarly-situated prisoners in the past;

(20) whether the applicant's release at this time is compatible with the welfare of society and whether it would depreciate the serious-

ness of the offense, considering the amount of time served by the applicant and the applicant's background;

(21) any information the board considers reliable regarding the facts of the crime;

(22) the board's perception of the applicant's risk to the community if released on parole; and

(23) any other factors that the board determines to be relevant in considering the prisoner's application.