NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| JAMES S. STONEKING,<br><br>　　　　　　Appellant,<br><br>　　　v.<br><br>STATE OF ALASKA,<br><br>　　　　　　Appellee. | Court of Appeals No. A-13993<br>Trial Court No. 4FA-20-02209 CI<br><br>**O P I N I O N**<br><br>No. 2800 — March 28, 2025 |

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Patricia L. Haines, Judge.

Appearances: Lindsey Bray, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Appellant. Thomas C. Mooney-Myers (briefing) and Christopher W. Yandel (oral argument), Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee. Susan Orlansky, Reeves Amodio LLC, Anchorage, for the American Civil Liberties Union of Alaska, as *amicus curiae*.

Before: Allard, Chief Judge, and Harbison and Terrell, Judges.

Judge HARBISON, writing for the Court.
Judge ALLARD, partially concurring, partially dissenting.

In 1987, James Stoneking broke into his estranged wife's house, murdered her, and critically injured another person. For this conduct, Stoneking was convicted of

first-degree murder, first-degree assault, and first-degree burglary, and was sentenced to a composite term of 99 years to serve.[1] In 2019, the Alaska Parole Board denied Stoneking's first application for discretionary parole and required him to serve an additional ten years before he could again apply for discretionary parole.[2] Stoneking filed an application for post-conviction relief challenging the Parole Board's decision. After the parties filed cross-motions for summary disposition, the superior court entered an order denying the application, and Stoneking now appeals that order.

On appeal, Stoneking's primary claim is that the Parole Board misapplied AS 33.16.100(a)(4), the statutory provision describing one of the four findings that the Board must make before releasing a defendant on discretionary parole. Under this provision, the Board must determine whether there is a reasonable probability that releasing the defendant "would not diminish the seriousness of the crime."[3]

Stoneking's appeal raises a question of statutory interpretation: what facts may the Parole Board take into account when it evaluates whether granting a defendant's application for discretionary parole will not diminish the seriousness of their crime, as is required by AS 33.16.100(a)(4)?

For the reasons we are about to explain, we conclude that the Parole Board may not rely on AS 33.16.100(a)(4) to deny an application for discretionary parole simply because the defendant was convicted of a crime the Board categorically deems "serious," including murder, nor may it deny parole based on the personal opinions of the board members regarding the appropriate sentence for a given offense. However, when the specific circumstances of the defendant's offense are significantly aggravated or egregious, AS 33.16.100(a)(4) authorizes the Board to deny a defendant's application

---

[1] AS 11.41.100(a)(1), former AS 11.41.200(a)(1) (1987), and AS 11.46.300(a)(1), respectively.

[2] *See* AS 33.16.100(h).

[3] AS 33.16.100(a)(4).

for discretionary parole if releasing the defendant would engender disrespect for the law or would be incompatible with societal norms.

In addition to challenging the Parole Board's interpretation of AS 33.16.100(a)(4), Stoneking raises three additional claims: (1) the Parole Board's factual findings were unsupported by the reviewable record; (2) the Parole Board's explanation of why it denied parole and how Stoneking could better prepare for a future application failed to comply with AS 33.16.130(c); and (3) the Parole Board acted arbitrarily in imposing a ten-year wait time before Stoneking could reapply for discretionary parole.[4] As we explain in this opinion, we reject Stoneking's claims of error and affirm the superior court's order dismissing Stoneking's application for post-conviction relief.

*Background facts and proceedings*

On January 3, 1987, Stoneking moved out of the home he shared with his wife, Maria Stoneking, and their two young children. Maria continued to live in the family home.

On February 8, Stoneking broke into Maria's home. The police arrested him and charged him with criminal trespass. Two days later, Maria contacted the police to report that Stoneking had again broken into the residence. On February 13, a judge

---

[4] As allowed by Alaska Appellate Rule 212(c)(9), the American Civil Liberties Union of Alaska (ACLU) obtained the consent of the parties to file an *amicus* brief in this case. In its brief, the ACLU explained that it asked to participate as an *amicus* because it believes that the Parole Board systematically denies parole based on a finding that releasing the defendant could "diminish the seriousness of the crime." The ACLU's brief provided statistical background information, descriptions of public statements made by members of the Parole Board regarding applications for discretionary parole, and descriptions of several other cases that the ACLU asserted were similar to Stoneking's case. The brief also discussed the ACLU's interpretation of the requirements set out by AS 33.16.100(a).

issued an order directing Stoneking not to have any contact with Maria and not to return to the home.

The following night, Maria was at home with Kenneth Jensen (a man with whom she had a relationship), and her two children, seven-year-old J.S. and two-year-old W.S. Stoneking drove past the house and saw Jensen's car outside. He then drove to his apartment, armed himself with a handgun, and returned to the house. He entered the house through a window and discovered Maria and Jensen sitting on the couch. After shooting both of them, Stoneking went upstairs, spoke to J.S., returned to Maria and Jensen, shot each of them again, and left the house.

J.S. later stated that she had been asleep in her bedroom when she woke up to the sound of gunshots. She exited her bedroom and encountered Stoneking "dressed up in dark clothing [and a mask] holding a gun underneath his arm." Stoneking told J.S. to return to bed, and she complied. Later that morning, J.S. came out of her room and saw Maria and Jensen. At Jensen's direction, J.S. called 911. When the police arrived, Maria was dead and Jensen was critically injured.

That same morning, the police located Stoneking at his apartment. When asked where he had been the previous night, Stoneking initially stated that he had gone to a movie, grabbed coffee and a coke, returned home, read his Bible, and then went to bed. He also stated that he awoke in the middle of the night worried about Maria, so he drove by Maria's house "to be satisfied things were normal."

After Stoneking told the police this version of events, the police informed him that J.S. had "implicated him." Stoneking then changed his story. He admitted that he had broken into the house through the back window, observed Maria and Jensen together on the couch, and shot both of them. He recalled seeing J.S. after J.S. had left her room. After this, he shot Maria again and, before leaving through the front door of the residence, he shot Jensen a second time. After Stoneking provided this account to the police, he led them to where he had disposed of the gun and other items connected to the shootings.

Maria died from two gunshot wounds to her chest. Jensen survived the shooting, but he sustained serious injuries, including limited functionality of his left arm and hand.

Stoneking was charged with first-degree murder (for killing Maria), attempted first-degree murder (for shooting Jensen), first-degree assault (also for shooting Jensen), and first-degree burglary.[5] At trial, he argued that he killed Maria while in the heat of passion after witnessing her engaged in adultery.[6] He also argued that he had not broken into the house in order to shoot Maria and Jensen, but rather, had broken in out of concern for the children.[7] The jury found Stoneking guilty of all charged offenses.[8]

At sentencing, the superior court merged the offenses involving Jensen into a single conviction for first-degree assault. The court imposed concurrent sentences of 99 years for the first-degree murder, 20 years for the first-degree assault, and 10 years for the first-degree burglary (the maximum sentences for each offense). In its remarks, the sentencing court explained that it had not restricted Stoneking's eligibility for parole and had not imposed consecutive sentences because Stoneking had a "good" chance of "successful rehabilitation."

Stoneking subsequently appealed his convictions, but not his sentence.[9] After this Court affirmed Stoneking's convictions on direct appeal, Stoneking made six unsuccessful attempts to reduce his sentence. Specifically, Stoneking filed four motions

---

[5] AS 11.41.100(a)(1), AS 11.41.100(a)(1) & AS 11.31.100, former AS 11.41.200(a)(1) (1987), and AS 11.46.300(a)(1), respectively.

[6] *Stoneking v. State*, 800 P.2d 949, 950 (Alaska App. 1990).

[7] *Id.* at 950-51.

[8] *Id.* at 949-50.

[9] *Id.*

to correct or modify his sentence, one federal habeas petition, and one application for executive clemency. He also wrote to the Parole Board and asked to be given a discretionary parole hearing earlier than the date he became statutorily parole eligible under AS 33.16.090. The Department of Corrections (DOC) summarily denied this request.

In September 2019, Stoneking filed a timely application for discretionary parole. When this application was filed, Stoneking had completed serving his sentences for first-degree burglary and first-degree assault. Stoneking was only seeking discretionary parole for his first-degree murder conviction.

After Stoneking's institutional probation officer received notice of Stoneking's parole application, the officer contacted the victims of Stoneking's offense, including J.S., Jensen, and Maria's family, to inform them of their right to provide information for use by the Board in making its decision. The officer also prepared a parole progress report recommending that the Board deny Stoneking's application for discretionary parole and referencing letters opposing Stoneking's release that had been written by four of the victims. By the time of the parole hearing, a total of seven victims, including Jensen and J.S., had written letters that detailed the ongoing effect Stoneking's conduct had on their lives and strongly opposing granting him parole.

The parole progress report stated that Stoneking had completed all relevant rehabilitative and educational programs, as well as several others. In the report, the officer acknowledged that Stoneking had done "very well in addressing his Offender Management Plan" and that he had no other criminal convictions. However, the officer recommended that Stoneking's application for discretionary parole be denied because of the violence and self-destruction Stoneking engaged in around the time he murdered Maria, and also because his conduct in the years leading up to the discretionary parole hearing showed that he had "not completely grasped the depth of his Murder conviction" and was "still attempting to diminish the seriousness of his crimes." The officer also noted the impact the crime had on the victims.

The Parole Board conducted a hearing on Stoneking's application in November 2019 and declined to parole Stoneking. The Board provided an oral explanation of its decision at the end of the hearing. It also subsequently issued a decision letter explaining why it had denied Stoneking's application, and notifying Stoneking that he must serve ten additional years before he could reapply for discretionary parole. After receiving the Board's letter, Stoneking asked the Board to reconsider its decision, but the Board denied this request in a second written letter, which provided more explanation for its decision.

Following the Parole Board's final administrative decision, Stoneking filed an application for post-conviction relief. In his application, Stoneking alleged that the Board had violated various statutory and constitutional provisions. He asked the superior court to vacate the Parole Board's decision and order a new hearing.[10]

In response, the State filed a motion for summary disposition, arguing that the Board had correctly interpreted the parole statutes, that its decision was based on substantial evidence, and that its decision was not an abuse of discretion. Stoneking filed a cross-motion for summary disposition, agreeing that there were no genuine issues of material fact and that the court could enter a judgment in favor of one party or the other as a matter of law.

After requesting and reviewing the complete record of the Parole Board proceedings, the superior court addressed each of Stoneking's contentions in a thoughtful thirty-one-page written order, ultimately granting the State's motion for summary disposition and dismissing Stoneking's application for post-conviction relief.

This appeal followed.

---

[10] Stoneking does not renew any of his constitutional claims on appeal.

*Alaska's discretionary parole laws*

We begin our discussion with an overview of Alaska's discretionary parole laws.[11]

Alaska Statute 33.16.090 explains when and whether a defendant will become eligible for release on discretionary parole. This statute also describes what portion of the sentence a defendant must serve before being considered for release on discretionary parole.[12]

After an eligible defendant applies for discretionary parole, the Parole Board considers the application.[13] Under AS 33.16.100(a), the Parole Board is authorized to grant the defendant discretionary parole if it determines a reasonable probability exists that (1) the defendant will not violate any laws or conditions of parole; (2) the defendant's rehabilitation and reintegration into society will be furthered by release on parole; (3) the defendant will not pose a threat of harm to the public; and (4) releasing the defendant on parole would not diminish the seriousness of the crime. Even if an inmate meets the eligibility criteria defined in AS 33.16.100(a) by a certain date, his or her release is still discretionary.[14]

The Parole Board's evaluation of an application for discretionary parole is guided by 22 Alaska Administrative Code (AAC) 20.165, which sets out twenty-three

---

[11] We cite to the current discretionary parole statutes in this opinion because both parties cite to the current discretionary parole statutes in their briefs. The parties have not raised the issue of which version of Alaska's discretionary parole statutes apply to the Parole Board's decision in this case.

[12] *See* AS 33.16.090. A separate statute, AS 12.55.115, permits courts to restrict a defendant's eligibility for discretionary parole, requiring them to serve a term that is greater than the time set out under AS 33.16.090, if the court does so at the time of sentencing.

[13] AS 33.16.060(a)(2).

[14] *Stefano v. Dep't of Corr.*, 539 P.3d 497, 504 (Alaska 2023).

factors (including a catch-all factor) for the Parole Board to consider.[15] Under this regulation, the Parole Board has the discretion to "determine the priority and weight to be given each factor when making a parole release decision."[16]

Prior to a discretionary parole hearing, the DOC prepares a preparole packet for use by the Parole Board.[17] The preparole packet includes, *inter alia*, the original presentence report, a preparole report prepared by staff of the correctional facilities in which the defendant has been incarcerated, information submitted by the defendant, and information submitted by the victims.[18] In cases involving a crime against a person, the victim may provide comments to the Parole Board in writing or in person, and the Board is required to "consider" such comments "in deciding whether to release the prisoner on parole."[19]

Under AS 33.16.130(b), a defendant applying for discretionary parole has the following procedural rights:

> [T]he prisoner is entitled to a hearing before the [B]oard. The commissioner . . . shall furnish to the prisoner a copy of the preparole reports . . . and the prisoner shall be permitted access to all records that the [B]oard will consider in making its decision except those that are made confidential by law. The prisoner may also respond in writing to all materials the

---

[15]   This regulation was promulgated in 1991 under the authority of AS 33.16.060(b)(1), which requires the Parole Board to establish "standards under which the suitability of a prisoner for . . . discretionary parole shall be determined."

[16]   22 AAC 20.165(c).

[17]   *See* AS 33.16.180(6) (stating that the Commissioner of the DOC shall prepare the preparole report referenced in AS 33.16.110(a)).

[18]   *See* AS 33.16.110(a)(1)-(11).

[19]   AS 33.16.120(c)-(d).

[B]oard considers, be present at the hearing, and present evidence to the [B]oard.[20]

If the Parole Board denies an application for discretionary parole, it may also "require that additional time be served before the prisoner is again eligible for consideration for discretionary parole."[21] The Board must "state the reasons for the denial, identify all of the factors considered relevant to the denial, and provide a written plan for addressing all of the factors relevant to the denial."[22]

*The Parole Board's decision in this case*

As we have explained, in this case, the Parole Board wrote Stoneking a letter explaining why it denied him parole. Then, after Stoneking sought reconsideration of this decision, the Board issued a second letter affirming its decision and providing additional information explaining its decision. In these letters, the Board noted that Stoneking had "done well" in prison, had participated in rehabilitative programming, and had given back to the community. However, the letters also listed several reasons why, in the Board's estimation, discretionary parole was inappropriate at that time:

- Stoneking minimized his actions and failed to take responsibility for what he had done.

- Stoneking failed to demonstrate remorse, "as evidenced by [his] actions leading up to [the parole] hearing, . . . [such as] asking that some victims be removed from receiving notifications."

- Stoneking's offense was "horrific." Stoneking murdered his wife while their children were in the home, and he engaged in a pattern of stalking and harassing behavior prior to the offense.

---

[20]   AS 33.16.130(b).

[21]   AS 33.16.100(h).

[22]   AS 33.16.130(c).

- Stoneking presented "as though [he was] entitled to discretionary parole . . . [and his] goal [was] merely to get out of prison," as evidenced by his requests for clemency and early release on parole.

- Stoneking's behavior had far-reaching and long-lasting detrimental effects on many people.

- The victims were very opposed to his release and the Board felt that "returning [him] to the community would have a harmful effect on them."

- The Board needed to consider "how much time is enough time" for Stoneking's crime. If Stoneking were paroled, he would "only have served the bare minimum for discretionary parole eligibility." Furthermore, if Stoneking were released "early" (*i.e.*, if he were released onto discretionary parole as soon as he became eligible), this would diminish the seriousness of his offense.

- Public safety was best served by Stoneking's continued incarceration. Stoneking's actions leading up to the parole hearing suggested that he is a "continued threat to the public at large."

The Parole Board's letters appear to acknowledge that Stoneking satisfied the first two parole criteria in AS 33.16.100(a)(1) and (a)(2), but that he did not satisfy the remaining two criteria in subsections (a)(3) and (a)(4), warranting the denial of parole. Indeed, the Board specifically stated that it was concerned that Stoneking would be a threat to the public if released on parole[23] and that releasing him would diminish the seriousness of the crime he committed.[24] The Board notified Stoneking that he would have to serve ten more years before he could again apply for discretionary parole.

---

[23] The Board stated that "public safety is best served by [Stoneking's] continued incarceration," and that Stoneking could be a "continued threat to the public at large."

[24] On appeal Stoneking asserts that the Board did not rely on subsection (a)(3) when it denied Stoneking's application. But as the superior court found in its written order, "the Board's two letters explicitly found that Stoneking failed to meet two of the four statutory release criteria. The Board determined that releasing Stoneking at that time would diminish the seriousness of his crime, and that he would pose a threat of harm to the public if

*Why we affirm the superior court's order dismissing Stoneking's application for post-conviction relief*

Stoneking argues that the superior court erred in dismissing his application for post-conviction relief when it failed to recognize that the Parole Board had misinterpreted AS 33.16.100(a).

Under AS 33.16.100(a), the Parole Board "may authorize the release of a prisoner . . . on discretionary parole if it determines a reasonable probability exists" that

> (1) the prisoner will live and remain at liberty without violating any laws or conditions imposed by the [B]oard;
>
> (2) the prisoner's rehabilitation and reintegration into society will be furthered by release on parole;
>
> (3) the prisoner will not pose a threat of harm to the public if released on parole; and
>
> (4) release of the prisoner on parole would not diminish the seriousness of the crime.[25]

Stoneking argues that each of the four subsections of this statute are rehabilitative and forward-looking, and that each is intended to probe, from a different angle, whether a defendant is sufficiently reformed to be reintroduced into society.[26] Stoneking thus asserts that subsection (a)(4), which asks whether release of the defendant on parole would "diminish the seriousness of the crime," requires the Parole

---

released." For the most part, Stoneking does not challenge the (a)(3) findings on appeal. Instead, Stoneking's appeal is largely limited to challenging the Board's reliance on subsection (a)(4).

[25] AS 33.16.100(a).

[26] In his opening brief, Stoneking asserted that these four subsections are "interconnected" and require a "comprehensive assessment" that evaluates all four subsections together. But during oral argument, he abandoned this argument and agreed with the State that the Board could properly deny an application for discretionary parole if it determined that there was a reasonable probability that any one of the four criteria would not be met.

Board to determine whether granting the defendant's application for parole would "fly in the face of the public sense of justice and reform," in light of the circumstances of the defendant's offense, the sentence, and the defendant's rehabilitation efforts while in prison. According to Stoneking, the Parole Board misinterpreted subsection (a)(4) by failing to construe it in this manner. He also faults the Board for considering "how much time is enough time" for his first-degree murder conviction.

Stoneking's contentions involve statutory interpretation, to which we apply our independent judgment.[27] When "interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[28] Under Alaska's sliding scale approach to statutory interpretation, "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[29]

We begin by examining the statutory language of AS 33.16.100(a). Each of the first three subsections of this statute contain language that is forward-looking. These subsections each require the Parole Board to assess whether there is a reasonable probability that the defendant's release on parole "will" have some future effect (*e.g.*, whether the defendant will refrain from violating the law or a probation condition, whether their rehabilitation will be furthered by the release, or whether their release will pose a threat of harm to the public).[30]

---

[27]  *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017); *see also Kohlhaas v. State*, 518 P.3d 1095, 1103-04 (Alaska 2022) (explaining the standard of review for statutory interpretation as *de novo*).

[28]  *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (internal quotations omitted).

[29]  *Muller v. BP Expl. (Alaska) Inc.*, 923 P.2d 783, 788 (Alaska 1996).

[30]  *See* AS 33.16.100(a)(1)-(3).

However, the plain language of subsection (a)(4) (that "release of the defendant on parole would not diminish the seriousness of the crime") does not have the same forward-looking focus.[31]

We next consider the statute's legislative history. We note that AS 33.16.100(a) was enacted in 1985 as part of comprehensive legislation that was intended to update the parole statutes following the legislature's enactment of presumptive sentencing.[32]

The earliest version of Alaska's parole statutes required the Parole Board to consider whether the defendant's release on parole would impact "the welfare of society" when it considered an application for discretionary parole.[33] The 1985 amendments initially adopted the same approach, but the legislation was rewritten to require the Board to consider the constitutional principles in Article I, Section 12 of the Alaska Constitution — *i.e.*, reformation of the defendant and protection of public[34] — and to reflect the sentencing criteria set out in the Alaska Supreme Court's seminal case

---

[31]   *See* AS 33.16.100(a)(4).

[32]   *See* SLA 1985, ch. 88, § 2; Letter from Governor Bill Sheffield to Representative Ben Grussendorf regarding H.B. 141 (Jan. 28, 1985), at 1-2 (contained in the Senate Judiciary Committee bill file for H.B. 141).

[33]   Former AS 33.15.080 (1962).

[34]   In 1985, when the amendments to AS 33.16.100(a) were written and then considered by the legislature, the Alaska Constitution stated that the administration of criminal justice was based on these two principles. In 1994, Article I, Section 12 was amended to add three additional principles: community condemnation of the offender, the rights of victims of crimes, and restitution from the offender. Alaska Const. art. I, § 12.

*State v. Chaney*.[35] The rewritten bill contained the four subsections, (a)(1) through (a)(4), that appear in the current version of AS 33.16.100.[36]

When this version of the bill was discussed by the House Health, Education and Social Services (HESS) Committee, the assistant attorney general who drafted the rewritten bill explained that each of the four subsections related to the *Chaney* criteria.[37] With regard to subsection (a)(4) (whether release of the defendant on parole will diminish the seriousness of the crime), he explained that this subsection requires the Board to consider the following questions: "How will society view this? Will this engender disrespect for the law in some way, shape, or form if we let this person out?"[38] In other words, subsection (a)(4) was intended to reflect the *Chaney* criterion codified in AS 12.55.005(6) — "the effect of the sentence to be imposed as a

---

[35] *See* Audio of the joint meeting of the House Health, Education and Social Services Committee and the House Judiciary Committee, H.B. 141, at 38:00 – 43:00 (Feb. 22, 1985); Letter from Assistant Attorney General Patrick Conheady to Representative Max Gruenberg regarding H.B. 141 (Mar. 5, 1985), at 1 (contained in the House Health, Education and Social Services Committee bill file for H.B. 141); *see also State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970). The *Chaney* criteria are (1) deterrence of the offender and others; (2) rehabilitation; (3) community condemnation and reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves; and (4) isolation of the offender from society to prevent criminal conduct during the period of confinement. *Chaney*, 477 P.2d at 444.

[36] Letter from Assistant Attorney General Patrick Conheady to Representative Max Gruenberg regarding H.B. 141 (Mar. 5, 1985), at 11 (contained in the House Health, Education and Social Services Committee bill file for H.B. 141); AS 33.16.100(a)(1)-(4).

[37] Audio of House Health, Education and Social Services Committee, H.B. 141, testimony of Assistant Attorney General Patrick Conheady, at 18:05 - 19:00 (Mar. 6, 1985).

[38] *Id.* at 21:28 - 21:35 (testimony of Assistant Attorney General Patrick Conheady).

community condemnation of the criminal act and as a reaffirmation of societal norms[.]"[39]

This version of the bill was passed by the House HESS Committee and moved to the House Judiciary Committee. In the House Judiciary Committee's review of the bill, the committee considered a "Sectional Analysis and Commentary" which had been prepared by the Department of Law.[40] The sectional analysis explained that the general standards set out by AS 33.16.100(a) "reflect the *Chaney* criteria and the purposes of sentencing in AS 12.55.005, particularly those concerned with rehabilitation, protection of the public, and the seriousness of the crime."[41]

The House Judiciary Committee voted to move the bill out of committee without any amendment to subsections (a)(1) through (a)(4), and the bill was signed into law later that session.[42] Since its enactment in 1985, these subsections have not been amended by the legislature.

Given this history, as well as the clarity of the statute's plain language, we reject Stoneking's claims that all four subsections of AS 33.16.100(a) are only focused on rehabilitation and on predicting the defendant's future conduct. Subsection (a)(4), in particular, is not focused exclusively on rehabilitation.[43] Instead, as we have explained,

---

[39] AS 12.55.005(6); *Chaney*, 477 P.2d at 444; *see Smith v. State*, 711 P.2d 561, 569 n.4 (Alaska App. 1985) (explaining that the *Chaney* sentencing criteria have been codified, in substance, in AS 12.55.005).

[40] Sectional Analysis and Commentary for C.S.H.B. 141, prepared for the House Judiciary Committee (Apr. 1, 1985), at 1.

[41] *Id.* at 3.

[42] *See* Letter from Assistant Attorney General Patrick Conheady to Representative Max Gruenberg regarding H.B. 141 (Mar. 5, 1985), at 1 (contained in the House Health, Education and Social Services Committee bill file for H.B. 141); SLA 1985, ch. 88, § 2.

[43] This is not to say that a defendant's rehabilitative efforts are irrelevant to subsection (a)(4). To the contrary, the Parole Board may certainly consider the defendant's efforts at rehabilitation when determining whether the defendant's release would diminish the

this subsection requires the Parole Board to determine whether a reasonable probability exists that "release of the prisoner on parole would not diminish the seriousness of the crime."[44] Based on the statute's legislative history, this subsection authorizes the Board to deny a defendant's application for discretionary parole if releasing the defendant would engender disrespect for the law or would be incompatible with societal norms.[45] Thus, when the Parole Board evaluates this subsection, it may properly consider the circumstances of the defendant's original offense.

But this does not mean that the Parole Board is permitted to find that whenever a defendant was convicted of a serious crime, releasing the defendant on parole will "diminish the seriousness of the offense."

In 1985, when the legislature promulgated AS 33.16.100(a), it also promulgated AS 33.16.090, which established the eligibility criteria for discretionary parole.[46] Under this statute, defendants who were convicted of first-degree murder were eligible for discretionary parole after serving a portion of their sentence.[47] When the legislature crafted this statute, it could have made such defendants ineligible for

---

seriousness of the offense. That is, whether it would diminish the seriousness of the crime to release a defendant may look entirely different for the defendant who has turned their life around in prison and made substantial strides towards rehabilitation, as opposed to the defendant who has not achieved rehabilitation.

[44]   AS 33.16.100(a)(4).

[45]   *See* Audio of House Health, Education and Social Services Committee, H.B. 141, testimony of Assistant Attorney General Patrick Conheady, at 21:21 - 21:35 (Mar. 6, 1985); *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).

[46]   SLA 1985, ch. 88, § 2.

[47]   *Id.* The statute has been amended several times since 1985, but a defendant convicted of first-degree murder remained eligible for discretionary parole under most circumstances. However, currently, if a defendant is sentenced to one or more mandatory 99-year terms under AS 12.55.125(a) or one or more definite terms under AS 12.55.125(*l*), they are not eligible for consideration for discretionary parole. AS 33.16.090(a)(1)(A).

discretionary parole or it could have required them to serve a longer portion of their sentence before becoming parole-eligible. But the legislature did not do this. Instead, it chose to include defendants who were convicted of these serious crimes in the category of defendants who were eligible for parole after serving a portion of their sentence.

This drafting decision indicates that the legislature believed that there would be some defendants who, despite being convicted of serious felony offenses (including murder), could be released on discretionary parole when they first became eligible without "diminish[ing] the seriousness of the crime." However, discretionary parole release could occur only after the defendant had served a portion of their sentence and the Board had completed an individualized assessment of the defendant's circumstances. Thus, if the Parole Board were to categorically deny applications for discretionary parole made by eligible defendants convicted of serious felony offenses, the Parole Board would, essentially, be substituting its own view — that a longer minimum punishment for a category of crimes is warranted — for the punishment codified by the legislature. This would be unlawful.

The Appellate Division of the New York Supreme Court, First Department, reached the same conclusion when it reviewed New York's discretionary parole laws in *King v. New York State Division of Parole*.[48] Under New York law, a defendant may be released on discretionary parole only if there is a reasonable probability that, if the defendant were released,

> he or she will live and remain at liberty without violating the law, and that his or her release is not incompatible with the welfare of society and will not so *deprecate the seriousness of his or her crime* as to undermine respect for law.[49]

---

[48] *King v. N.Y. State Div. of Parole*, 598 N.Y.S.2d 245, 251-52 (N.Y. App. Div. 1993), *aff'd*, *King v. N.Y. State Div. of Parole*, 632 N.E.2d 1277 (N.Y. 1994).

[49] N.Y. Exec. Law § 259-i(2)(c)(A) (emphasis added). The requirements of this statute are very similar to those of AS 33.16.100(a)(1), (3), and (4).

In *King*, the defendant was convicted of felony murder for the killing of an off-duty police officer while robbing a restaurant.[50] At the time of his offense, King was twenty-one years old and had no prior contacts with law enforcement.[51] When he became eligible, King applied for discretionary parole, but his application was denied.[52]

In issuing its decision, the Parole Board noted King's "excellent institutional adjustment, including [a] BA . . . in sociology," but it cited the following grounds for declining to grant him parole: "[the] nature, circumstances and seriousness of the present offense: murder one, manslaughter two, and assault one."[53]

On appeal, New York's intermediate appellate court held that the Parole Board's decision "was based on a fundamental misunderstanding of its role and its power, and was not in accord with statutory requirements."[54] The court noted that a member of the Parole Board had made remarks at the parole hearing which "demonstrate[d] that the Board was proceeding on the assumption that its primary duty was to determine, in the abstract, the appropriate penalty for murder in today's society."[55] These remarks, the court explained, suggested that the Board had infringed on the legislature's authority. The court held that "determining the appropriate penalty to be imposed for the commission of a particular crime is fundamentally a function

---

[50]  *King*, 598 N.Y.S.2d at 246.

[51]  *Id.* at 247.

[52]  The Parole Board denied his application twice. *Id.*

[53]  *Id.* at 249.

[54]  *Id.* at 250.

[55]  *Id.* at 251.

which belongs in the hands of elected officials" and that the Parole Board could not "resentence [the] petitioner according to the personal opinions of its members."[56]

The New York intermediate appellate court distinguished between denying parole because of the *category* of offense, which is prohibited, and denying parole based on the particularly aggravated *factors of a specific offense*, which is permissible:

> [I]n order to preclude the granting of parole exclusively on [the seriousness of the crime] there must have been some significantly aggravating or egregious circumstances surrounding the commission of the particular crime. Certainly every murder conviction is inherently a matter of the utmost seriousness since it reflects the unjustifiable taking and tragic loss of a human life. Since, however, the legislature has determined that a murder conviction *per se* should not preclude parole, there must be a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself.[57]

Like the New York courts, we conclude that the Parole Board cannot deny parole under AS 33.16.100(a)(4) simply because the defendant was convicted of a serious crime, including murder. However, when the circumstances of a specific offense are significantly aggravated or particularly egregious such that releasing the defendant would engender disrespect for the law or be incompatible with societal norms, the Board may consider those circumstances when evaluating whether release on discretionary parole would "diminish the seriousness of the offense."[58]

---

56  *Id.*

57  *Id.* (citation omitted).

58  *See* AS 33.16.100(a)(4); Audio of House Health, Education and Social Services Committee, H.B. 141, testimony of Assistant Attorney General Patrick Conheady, at 21:21 - 21:35 (Mar. 6, 1985); *see also Phillips v. Dennison*, 834 N.Y.S.2d 121, 124-25 (N.Y. App. Div. 2007) (explaining that if the facts of the offense are serious enough, parole may be denied if the defendant's release could "deprecate the seriousness" of the crime).

Stoneking notes that at his parole hearing, one of the members of the Parole Board stated that "the hardest thing that we have to decide is how much time is enough time when a life has been taken." And in the Board's letter denying parole, the Board repeated this claim, stating that it was required to "consider how much time is enough time [when a life is taken.]" Stoneking asserts that these statements indicate that the Board seemed to think that AS 33.16.100(a)(4) required it to determine the appropriate penalty for murder.

We agree that the statements identified by Stoneking were improper. Because a "life is taken" each time a defendant commits a homicide (*i.e.*, murder, manslaughter, or criminally negligent homicide), when the Parole Board evaluates whether granting parole to a homicide defendant will "diminish the seriousness of the offense," it is improper for the Board to rely on the fact that the defendant caused the victim's death. Furthermore, the challenged remarks suggest that the Parole Board mistakenly believed that it should deny parole whenever a defendant convicted for murder first appeared before the Parole Board.

Despite the impropriety of the challenged remarks, we conclude that the record as a whole indicates that the Board ultimately did not deny parole because Stoneking committed murder, a serious category of offense. Rather, as the superior court noted in its order denying post-conviction relief, the Parole Board "specifically referenced facts and circumstances surrounding the crime" and Stoneking's behavior afterwards when it declined to parole him. One board member pointed out that when Stoneking went to Maria's house, he had a gun and a mask and was violating a protective order. Then, in its decision letter, the Board characterized Stoneking's offense as "horrific," pointing out that he murdered Maria while their children were in the home. The Board noted that Stoneking had engaged in a "pattern of stalking and harassing behavior . . . prior to the offense." With respect to Stoneking's behavior since he committed the crime, the Board found that Stoneking had minimized his conduct and failed to take responsibility for his actions.

Given these individualized findings, we conclude that the record establishes that the Parole Board considered the specific aggravated details of Stoneking's offense and his lack of remorse, rather than simply basing its decision on the category of the offense for which Stoneking was convicted.[59]

### Why we conclude that the Parole Board's factual findings were supported by the record

Stoneking argues that the Parole Board's factual findings were not supported by the record. Stoneking asserts: (1) the Board considered information outside the reviewable record; (2) the Board erred in finding that Stoneking did not adequately accept responsibility or show remorse; and (3) the Board's findings did not sufficiently reference Stoneking's rehabilitative efforts or release plan. We now address each of these arguments.

#### 1. Whether the Parole Board considered information from outside the record

Stoneking first argues that the Board erred by considering three facts that Stoneking claims were not properly part of the record: that he requested an early parole hearing, that he asked the DOC to remove Kenneth Jensen's name from the victim-notice list, and that he applied for executive clemency. According to Stoneking, no statute or regulation expressly authorizes the Parole Board to consider this information, and it was improper for it to do so.

---

[59] Furthermore, as we noted earlier, the superior court found that the Parole Board had articulated a second valid basis for denying Stoneking discretionary parole — that Stoneking's release would pose a threat of harm to the public. *See* AS 33.16.100(a)(3). Because Stoneking does not challenge this finding on appeal, it provides an independent basis for affirming the Parole Board's decision.

Alaska Statute 33.16.110(a) lists information that the Board "shall consider" when "determining whether a prisoner is suitable for discretionary parole."[60] This provision contains eleven categories of information, including "(4) recommendations made by the staff of the correctional facilities in which the prisoner was incarcerated" and "(11) other relevant information that may be reasonably available."[61]

In keeping with AS 33.16.110(a)(4), Stoneking's institutional probation officer, Michael Zener, wrote a parole progress report for the Parole Board's consideration. In this report, Zener stated that Stoneking had requested an early parole hearing and that Stoneking had asked the DOC to remove Jensen's name from the victim notification list. We conclude that this information falls within AS 33.16.110(a)(4), as it was contained in Zener's formal recommendation to the Parole Board regarding Stoneking's parole application.

Regarding Stoneking's application for clemency, a Parole Board member commented at the parole hearing that Stoneking had applied for executive clemency, and, in response, Stoneking acknowledged this. Furthermore, under AS 33.16.060(a)(8), clemency applications are directed to the Parole Board for investigation. We thus conclude that this information was "reasonably available" to the Parole Board, as is required by AS 33.16.110(a)(11).

Stoneking loosely suggests that AS 33.16.110(a)(11) is inapposite because his application for clemency was not relevant to any issue before the Parole Board and that, by considering his clemency application, the Board was punishing him for exercising his right to take certain legal action. We agree with Stoneking that the Parole Board may not penalize an inmate for the use of legitimate procedural mechanisms to

---

[60]  AS 33.16.110(a).

[61]  *Id.* at (a)(4), (11).

challenge a sentence. At the same time, we agree with the superior court that an inmate's "sustained campaign to reduce a sentence by any available means [is relevant to the Board's assessment of] the inmate's credibility and whether the inmate's expressed remorse for a crime and apparent efforts at rehabilitation are sincere." We accordingly reject Stoneking's assertion that the Board improperly considered his clemency application.

For these reasons, we conclude that the challenged information was properly part of the Parole Board's record.

### 2. Whether the Parole Board erred in finding that Stoneking did not adequately accept responsibility for his actions

Stoneking next argues that the Parole Board lacked a substantial basis to find that he failed to adequately accept responsibility for his actions or show remorse.

The parties agree on the standard of review that we should apply to the Parole Board's factual findings: the "substantial evidence test." Under this standard, the reviewing court ascertains whether "a reasonable mind might accept [the evidence] as adequate to support a conclusion."[62]

As the superior court explained in its written order, the record supports the Parole Board's finding that Stoneking minimized his actions and thus failed to accept responsibility for them.

In Stoneking's discretionary parole application, he wrote that he killed Maria in a heat of passion, that he lost control, and that he was not capable of rational

---

[62] *Handley v. State, Dep't of Rev.*, 838 P.2d 1231, 1233 (Alaska 1992) (quoting *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)) (explaining that under the "substantial evidence" test used for reviewing factual determinations in administrative decisions, the court need only determine whether such evidence exists; it does not choose between competing inferences and does not evaluate the strength of evidence); *see also Covington v. State*, 938 P.2d 1085, 1090-91 (Alaska App. 1997) (citing *Handley*, 838 P.2d at 1233 for the proposition that we review the Parole Board's factual findings under the "substantial evidence" test).

thoughts. Then, at Stoneking's parole hearing, he told the Parole Board that he went to Maria's house only to get his children, and he implied that he shot Jensen in imperfect self-defense. But the presentence report contradicted both of these accounts. The presentence report stated that Stoneking went to Maria's house with a ski mask and a gun. While there, he killed Maria and critically injured Jensen. He then hid the evidence and lied to the police about his whereabouts. The contrast between the facts of the underlying offense and Stoneking's statements during the parole proceedings about what occurred supports the Board's finding that Stoneking has continued to minimize his actions.

### 3. Whether the Board's findings sufficiently referenced Stoneking's rehabilitative efforts or release plan

Stoneking next argues that the Parole Board's findings did not sufficiently reference his rehabilitative efforts or release plan. But AS 33.16.130(c) does not require the Parole Board to provide the defendant with an explanation regarding the release factors that they have met; this statute only requires the Board to "state the reasons for the denial [and] identify all of the factors considered relevant to the denial."[63] Because the Parole Board's multiple denial letters in this case provided the required explanation, we reject Stoneking's claim that AS 33.16.130(c) required the Parole Board's decision letters to provide additional information and analysis about Stoneking's rehabilitative efforts or his release plan.

*Whether the Board properly exercised its discretion when it declined to release Stoneking on discretionary parole*

Stoneking next argues that the Parole Board abused its discretion when it declined to release him on discretionary parole. The parties agree that we should apply

---

[63] AS 33.16.130(c).

the "reasonable basis" standard to our review of the Parole Board's exercise of its discretionary authority.[64] Under this standard, the reviewing court ascertains whether

_____

[64] *Covington*, 938 P.2d at 1090-91 ("The [P]arole [B]oard's exercise of its discretionary authority is reviewed under the 'reasonable basis' standard, to insure that its determinations are supported by evidence in the record as a whole and there is no abuse of discretion."); *Duyck v. State*, 2008 WL 269462, at *1 (Alaska App. Jan. 30, 2008) (unpublished); *see also Walker v. State*, 2020 WL 7774938, at *2 n.5 (Alaska App. Dec. 30, 2020) (unpublished) (explaining that the actions of a Parole Board are afforded only limited review in court rather than a *de novo* assessment).

We question whether the standard of review from *Covington* is appropriate to apply under the circumstances of Stoneking's case. In *Covington*, this Court reviewed on appeal the Parole Board's decision to revoke the defendant's parole for failure to comply with his conditions of release. *Covington*, 938 P.2d at 1088. In Stoneking's case, however, this Court is reviewing on appeal the Parole Board's decision to grant the defendant discretionary parole in the first instance. Previously, this Court has cited to *Covington* and applied the same standard of review to the parole revocation and parole granting function. *E.g.*, *Duyck*, 2008 WL 269462, at *1. Our review in Stoneking's case of the legislative history of C.S.H.B. 141, the precursor to Alaska parole statute (AS 33.16), has left us uncertain whether the "reasonable basis" standard from *Covington* applies in equal force to the parole revocation and parole granting functions of the Parole Board.

As we explained *supra*, in the text accompanying note 40, the Alaska Department of Law prepared a Sectional Analysis and Commentary that was used by the House Judiciary Committee in its consideration of C.S.H.B. 141. Sectional Analysis and Commentary for C.S.H.B. 141, prepared for the House Judiciary Committee (Apr. 1, 1985). In a section titled "Due Process Considerations," the Sectional Analysis separately discussed due process considerations that apply to the Board's parole granting function and parole revocation function. *Id.* at 8-17. When discussing the parole granting function, the Analysis cited to *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979), noting that the language of AS 33.16.100(a) "is intentionally discretionary" and that the language itself "does not create a liberty interest in the Alaska statutory scheme of discretionary parole." *Id.* at 9-10. But when discussing the parole revocation function, the Analysis cited to *Morrissey v. Brewer*, 408 U.S. 471 (1972), noting that defendants who have been released on parole have a conditional liberty interest in not returning to prison. *Id.* at 8, 13-16.

In Stoneking's case, the parties agree that the "reasonable basis" standard applies to this Court's review of the parole granting function, and the question that we now raise has not been briefed by the parties. We therefore apply the "reasonable basis" standard from *Covington* in our review of the Parole Board's decision to deny Stoneking discretionary parole.

the Board's "determinations are supported by the evidence in the record as a whole and there is no abuse of discretion."[65]

Stoneking's challenge to the Board's exercise of its discretion is inextricably linked to his claim challenging the Board's underlying factual findings that he had minimized his actions and failed to take responsibility for them. Indeed, as the superior court pointed out, an inability to fully accept responsibility for one's criminal actions and for the harm inflicted on the victims may indicate a continued risk to the public. Such findings may also be relevant to determining whether releasing the defendant would diminish the seriousness of the offense. Because we have determined that the Board's underlying factual findings regarding Stoneking's minimization and lack of remorse are supported by substantial evidence, we also conclude that the Board had a reasonable basis for declining to release Stoneking to discretionary parole.

### *Why we conclude that the Parole Board provided adequate guidance for addressing the factors relevant to its denial of parole*

When the Parole Board denied Stoneking parole, it issued a two-page letter explaining its decision and informing him that he will be allowed to reapply for discretionary parole in ten years. The Board later issued a second letter, in which it denied reconsideration of its parole decision. Stoneking contends that the Parole Board's letters did not sufficiently explain why it did not release him on parole, and did not provide concrete guidance for how he could prepare a successful future parole application. The superior court rejected these claims, finding that the Parole Board's two written decisions, taken together, complied with AS 33.16.130(c). We agree with the superior court's ruling.

---

[65] *Covington*, 938 P.2d at 1091.

Alaska Statute 33.16.130(c) was passed as part of the 1985 Parole Administration Act.[66] Under this statute, if the Parole Board denies discretionary parole, it must "state the reasons for the denial, identify all of the factors considered relevant to the denial, and provide a written plan for addressing all of the factors relevant to the denial."[67]

In *Frank v. State*, this Court interpreted AS 33.16.130(c) to require that the Parole Board provide reasons for denying parole that are sufficient for the defendant to understand why their application failed, to guide their future behavior, and to allow for judicial review.[68] In that case, the Parole Board had denied Frank's application for discretionary parole and told him that he could reapply in ten years.[69] The Board provided him with a one-page form that contained "a checklist of nine generic reasons for denying parole."[70] Five boxes had been checked off, and the form indicated that there were "factors" that had not been met, but it did not explain what these factors were.[71]

---

[66]  SLA 1985, ch. 88, § 2.

[67]  AS 33.16.130(c).

[68]  *Frank v. State*, 97 P.3d 86, 90-91 (Alaska App. 2004).

[69]  *Id.* at 88.

[70]  *Id.* at 87.

[71]  *Id.* at 89-90. The five checked boxes were (1) "Aggravating factors are present which prompt the Board to go above the guidelines in denying your parole"; (2) "The Board noted the very serious nature of your crime and/or the history of violence and pattern of criminal behavior which your file presents, and have assessed that you are a high risk for criminal behavior or high risk to violate conditions in the future"; (3) "The Board felt that additional time incarcerated before your release date would allow you more time to formulate a realistic and firmly based release plan"; (4) "The Board felt that additional time incarcerated would allow you the possibility of taking advantage of treatment and/or training/education programs that are available within the institution"; (5) "The Board has noted factors regarding your institutional behavior. This may have included: major

Frank appealed, arguing that the Parole Board failed to comply with AS 33.16.130(c) because its explanation for denying him parole was insufficient.[72] This Court agreed, and we remanded so that the Board could issue a revised written decision.[73] Regarding what AS 33.16.130(c) requires of the Parole Board, we explained that

> We construe this statutory mandate to mean that the Board must describe its reasons in sufficient detail that inmates can understand in what respects they have fallen short — so that inmates can guide their future behavior, and so that they can prepare more satisfactory future applications for parole. In addition, the Board must describe the reasons for its decision in sufficient detail to allow meaningful judicial review — so that reviewing courts can determine whether parole has been denied for an impermissible reason.[74]

Applying this standard, we concluded that the Parole Board's decision was not specific enough to allow for meaningful judicial review or to "allow Frank to guide his future behavior or draft future parole applications that might satisfy the Board's concerns."[75] We noted that the Board indicated that various "factors" in Frank's case were not met, but those factors were not individualized to Frank's case.[76] We also noted that the Board seemed to rely on other reasons for denying parole that it did not mention to Frank.[77]

---

infractions, disciplinary actions, poor/no institutional work history, poor/no program participation, or criminal behavior during incarceration." *Id.*

[72] *Id.*

[73] *Id.* at 93.

[74] *Id.* at 90.

[75] *Id.* at 91.

[76] *Id.* at 89-90.

[77] *Id.*

Stoneking argues that the Parole Board's explanation for why it denied parole did not satisfy AS 33.16.130(c) and *Frank*. We disagree.

We first note that, unlike the Parole Board in *Frank*, the Parole Board in Stoneking's case provided case-specific reasons explaining why it denied discretionary parole. The Parole Board noted that Stoneking engaged in a "pattern of stalking and harassing behavior" before he murdered Maria which aggravated the circumstances of his crime, that Stoneking continued to demonstrate a lack of remorse at the time of the parole hearing, and that Stoneking desired to get out of prison above anything else. The Board also noted the impact that Stoneking's crime had on his victims and the community and stated that Stoneking's actions since the crime (minimizations and manipulations) indicated that he was not sufficiently reformed and thus remained a "continued threat to the public at large."

The Parole Board also provided Stoneking with case-specific examples of how he had fallen short. The Parole Board stated that Stoneking showed a lack of remorse as evidenced by his attempt to have Jensen removed from the notification list. The Parole Board also pointed to Stoneking's minimizing of his criminal actions and failure to take accountability at the parole hearing. Finally, the Parole Board noted that Stoneking lacked insight into why his parole officer recommended parole be denied. These comments met *Frank*'s requirement that the Board must "describe its reasons in sufficient detail that inmates can understand in what respects they have fallen short."[78]

Accordingly, we conclude that the Parole Board provided adequate guidance for Stoneking to submit more satisfactory applications in the future.

---

[78] *Id.* at 90.

*Why we conclude that the ten-year wait time before Stoneking could reapply for parole was not an abuse of its discretion*

Stoneking argues that the Parole Board arbitrarily foreclosed him from reapplying for discretionary parole for ten years. The State, citing to AS 33.16.100(h), argues that the Board did not err because the legislature delegated to the Board broad authority to restrict a prisoner's future eligibility for discretionary parole. Alaska Statute 33.16.100(h) provides,

> If the [B]oard considers an application for discretionary parole and denies parole because the prisoner does not meet the standards in (a) or (g) of this section, the [B]oard may make the prisoner ineligible for further consideration of discretionary parole or require that additional time be served before the prisoner is again eligible for consideration for discretionary parole.

The legislative history of AS 33.16.100 reflects the legislature's intention to give the Parole Board nearly unbridled discretion when determining that a defendant must serve additional time before they may again apply for discretionary parole.[79] In Stoneking's case, the Parole Board evaluated the four factors that must be satisfied in order to grant discretionary parole and determined that, at the time it conducted the hearing, there was a reasonable probability that releasing Stoneking would diminish the seriousness of his crime. It apparently determined, however, that this calculus could change if Stoneking were to serve an additional ten years — *i.e.*, that if he served the additional ten years, there would be a substantial likelihood that releasing him on parole would not diminish the seriousness of his offense. We conclude that, given the facts of this case, the Parole Board did not abuse its discretion when it made this determination.

---

[79] Sectional Analysis and Commentary for C.S.H.B. 141, prepared for the House Judiciary Committee (Apr. 1, 1985), at 10-12.

*Conclusion*

The judgment of the superior court is AFFIRMED.

Judge ALLARD, partially concurring, partially dissenting.

I agree with the majority that the Parole Board oversteps its authority when it treats all defendants convicted of murder as inherently ineligible for discretionary parole based on the seriousness of their crimes.[1] As the New York court held in *King*, "The role of the Parole Board is not to resentence [the] petitioner according to the personal opinions of its members as to the appropriate penalty for murder, but to determine whether, as of this moment, given all of the relevant statutory factors, [the petitioner] should be released."[2] I also agree with the majority that, in this particular case, the Board's findings are supported by the record and its decision to deny discretionary parole was not an abuse of discretion. Where I disagree with the majority is with regard to the adequacy of the Board's guidance to Stoneking regarding what he should do to prepare a better application for discretionary parole. In my view, the Board's comments were insufficient to allow Stoneking "to guide his future behavior or draft future parole applications that might satisfy the Board's concerns."[3] I likewise conclude that the Board failed to adequately explain why Stoneking must wait an additional ten years before he can reapply for discretionary parole and that the Board failed to justify why this length of time was required. Accordingly, I would affirm the Board's denial of discretionary parole but I would remand this case to the Parole Board for clarification and, if appropriate, reconsideration of the ten-year moratorium and a clearer explanation for what Stoneking should do to prepare for his next discretionary parole application.

---

[1] *See King v. N.Y. State Div. of Parole*, 598 N.Y.S.2d 245, 251 (N.Y. App. Div. 1993), *aff'd*, *King v. N.Y. State Div. of Parole*, 632 N.E.2d 1277 (N.Y. 1994).

[2] *Id.*

[3] *Frank v. State*, 97 P.3d 86, 91 (Alaska App. 2004).